## STATE v. SWIFT & CO. et al.

### No. 9481.

Court of Civil Appeals of Texas. Austin.
March 21, 1945.

Rehearing Denied April 11, 1945.

Grover Sellers, Atty. Gen., and Benjamin Woodall, Fred C. Chandler, Eugene Alvis, J. C. Davis, and Elbert Hooper, Asst. Attys. Gen., for appellant.

Baker, Botts, Andrew, & Wharton, Walter H. Walne, and John P. Bullington, all of Houston, and Dan Moody, of Austin, for appellees.

BLAIR, Justice.

The State of Texas instituted this suit against Swift & Company, herein called Swift, an Illinois meat packing corporation with permit to do business in Texas, and against Consumers Cotton Oil Company, herein called Consumers, a Texas corporation engaged in the cottonseed oil mill and gin business in Texas. The State alleged that Swift owns all of the stock of Consumers and so dominates and controls it as to make Swift in fact doing the cottonseed oil mill and gin business in Texas without a permit to do so, in violation of the provision of Art. 1529, R.S.1925, requiring a foreign corporation to obtain a permit before doing any business in Texas, and therefore subject to the penalties imposed by Art. 1536, R.S. 1925, Vernon's Ann.Civ. St. Art. 1536, for doing business without a permit, which penalties the State sought to recover. The State further alleged: 1. That the ownership of all or substantially all of the stock of Consumers by Swift is per se unlawful, because through such ownership of all the stock is authorized to dominate and control Consumers to the extent that Swift is in fact engaged in the

130

cottonseed oil mill business in Texas without a permit to do so. 2. That since Swift is a meat packing corporation it is acting ultra vires and in excess of the powers granted by its permit to do that business in Texas by owning all of the stock, and dominating and controlling Consumers, the Texas corporation engaged in the cottonseed oil mill and gin business, in violation of the provision of Art. 1349, R.S. 1925, inhibiting a foreign corporation from employing or using its means, assets, or other property for any purpose other than for the legitimate business for which it is created, and therefore subject to the forfeiture of its permit to do business in Texas under the provision of Art. 1351, R.S. 1925, Vernon's Ann.Civ.St. art. 1351. Because of these two alleged unlawful activities of Swift the State sought to cancel its permit to do business in Texas and to forfeit the corporate charter of Consumers as in a quo warranto proceeding under the provisions of Arts. 6253, 6257, and 6258 (now Texas Rules of Civil Procedure, rule 782), R.S. 1925.

Swift specially excepted to the portion of the petition seeking to recover penalties for doing business without a permit, because the petition alleged that it did have a permit to do business in Texas; which exception was sustained. Swift further answered by denying that it dominates and controls Consumers through its stock ownership, or that such stock ownership is unlawful; and by a plea of res adjudicata of all matters set up in this suit under certain judgments rendered in the case of the State of Texas v. Swift & Company, et al., filed in the 26th District Court of Travis County, Texas, in 1915, the judgments relied upon being fully plead. The Consumers answered by a general denial.

The trial to the court without a jury resulted in judgment that the State take nothing by its suit against either Swift or Consumers; hence this appeal by the State.

Three questions are presented:

1. Is the ownership of all of the stock of Consumers by Swift per se unlawful as authorizing Swift to engage in the cottonseed oil mill and gin business in Texas without having a permit to do so?

2. If not per se unlawful, does the evidence show that Swift through such ownership of stock actually dominates and controls Consumers so as to be in fact itself engaged in the cottonseed oil mill and gin business in Texas without having a permit to do so?

3. Is the judgment or judgments plead by Swift res adjudicata of the questions presented?

Preliminary to a discussion of the questions presented a brief history of the transactions leading to this litigation will be stated. Swift & Company is an Illinois corporation engaged in the slaughtering and meat packing business. It has had a permit to engage in that business in Texas since 1907. Neither its charter nor the laws of Illinois prohibit it from owning the stock of said Consumers Cotton Oil Company. Prior to 1915 Swift and other corporations became involved in the ownership, operation and control of a large number of cottonseed oil mills and cotton gins in Texas to such an extent as to violate the Texas anti-trust laws. This resulted in the suit being filed by the State in 1915 in the 26th District Court of Travis County, Texas, to recover statutory penalties for such violations and to forfeit the charter and the permit to do business in Texas of each offending corporation. The suit was compromised and settled and on December 14, 1915, a consent decree was entered in the case. Under the terms of the agreement and consent decree applicable to Swift three trustees were appointed to supervise the management of the group of mills and gins owned or controlled by Swift until such time as same could be sold at reasonable prices upon court approval so as to continue them as "competitive factors" in the cottonseed oil mill and gin business or industry. A few of the mills and gins were sold under court approval, but the majority remained unsold. Later, the number of trustees was reduced to one who continued to supervise the operation of the properties; the consent decree reserving in the court jurisdiction to enter such other and further orders as might be necessary to effectuate the purpose and intent of the consent decree. After twenty-three years a sale of a majority of the properties had not been made. In 1938 counsel for Swift discussed the situation with W. A. Keeling, the then trustee of the court, and he suggested that the terms of the consent decree having been complied with as to payment of fines and penalties, the remaining terms of the consent decree could be complied with by Swift causing a Texas corporation to be formed and conveying all the prop-

erties to it; Swift to own all the stock of such Texas corporation. A petition was then filed by Swift in the anti-trust proceeding seeking authority to form the Texas corporation, with authority to own all its stock to be operated so as to not violate the anti-trust laws of Texas. The Attorney General filed an answer opposing the relief sought by Swift; but after a hearing of the matter the court granted the relief prayed for and authorized Swift "to cause to be formed a Texas corporation to which it may cause to be conveyed all of the oil mill and gin properties now owned by it as hereinabove found, and at or after such conveyance that Swift and Company may acquire and own all of the capital stock of said corporation." Pursuant to this court decree appellee Consumers Cotton Oil Company was formed, and appellee Swift & Company acquired all of the stock of Consumers, which has continued to operate the properties under such set-up. On May 11, 1944, after this suit was filed, Swift & Company of Illinois sold the stock to Swift & Company of Nevada, a Nevada corporation having no permit to do business in Texas, and doing none in Texas. The facts as to the relationship of the two corporations under the stock ownership and acts carrying on the business of Consumers since 1938, to the date of the filing of this suit for the purposes hereinabove stated, will be later found and discussed. The foregoing facts and transactions will suffice to determine the first question presented.

■ The first question: Is the ownership of all of the stock of Consumers by Swift per se unlawful as authorizing Swift to engage in the cottonseed oil mill and gin business in Texas without having a permit to do so? We think the question should be answered in the negative.

■ The cases are legion which deal with the relationship of two or more corporations as the result of the ownership of the stock of one in another or others. It is generally held that the "ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest * * * or create the relation of principal and agent or representative between the two"; and that the parent or corporation owning the stock of another is regarded as principal only "where stock ownership has been resorted to, not for the purpose of participating in the affairs of the corporation in the normal and usual manner, but for the purpose of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies." Chicago, M. & St. P. R. v. Minneapolis Civic & Commerce Ass'n., 247 U.S. 490, 38 S.Ct. 553, 557, 62 L.Ed. 1229; United States v. Lehigh Valley R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458; United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; United States v. Delaware, L. & W. R. Co., 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438. Nor does the mere fact that the same persons are directors or managers of two corporations make them one entity, or create of them the relationship of principal and agent or representative. The same persons may form as many separate corporations to carry on as many separate businesses as they may wish. It is only where one corporation actually owns and dominates another that "the independent entity of the two companies is so far disregarded that each is considered as but a part of the indivisible whole." Kimberly Coal Co. v. Duglas, 6 Cir., 45 F.2d 25; In re Kentucky Wagon Mfg. Co., D.C., 3 F.Supp. 958; Law v. McLaughlin, D.C., 2 F.Supp. 601; McCaskill Co. v. United States, 216 U.S. 504, 30 S.Ct. 386, 54 L.Ed. 590. Courts often look, however, beyond the corporate form to the purpose of the corporation, and officers who are identified with that purpose to determine whether a single or integrated public utility business is being operated by two or more affiliated corporations, and particularly with respect to the exercise of regulatory and rate making powers by public administrative boards or commissions, because to permit such public utilities to operate through other separate legal entities created and owned by them would enable them to defeat the jurisdiction of the board or commission over such interrelated or affiliated corporate businesses. Gallatin Natural Gas Co. v. Public Service Co., 79 Mont. 269, 256 P. 373; Pontiac, O. & N. Ry. Co. v. Michigan R. R. Com., 203 Mich. 258, 168 N.W. 927; Atchison T. & S. F. R. Co. v. Railroad Commission, Tex.Civ.App., 77 S.W.2d 773 (writ ref.); State v. Lone Star Gas Co., Tex.Civ.App., 86 S.W.2d 484 (writ ref.). The general rule seems to be that courts will not because of stock ownership or interlocking directorship disregard the separate legal identities of corporations, unless such relationship is used to defeat public convenience, justify wrongs,

such as violation of the anti-trust laws, protect fraud, or defend crime. State v. Humble Oil & Refining Co., Tex.Civ.App. 263 S.W. 319 (writ ref.); Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599; Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; Texas Pacific Coal & Oil Co. v. Smith, Tex.Civ.App., 130 S.W. 2d 425, 428, wherein one corporation owned all the stock of another and the two corporations had the same officers and directors but operated separate businesses, and wherein the court held:

"* * * The two corporations had the same officers and directors and a common place of business. It may be granted that the Oil Company, through ownership of the stock of the foreign holding company, had the power to control the Surety Company. In our opinion there was no evidence to establish, or raise an issue of the fact, that the officers or agents of the Surety Company were by reason of their status as such, officers or agents of the Oil Company. The Surety Company was conducting no business in which the Oil Company was engaged, or in which its charter powers permitted it to engage. There was, therefore, no evidence to show that the Surety Company was 'but an instrumentality or adjunct' of the Oil Company as the dominant corporation. There was no evidence to support an inference that the organization of the Surety Company was 'a mere sham' or used as 'an instrument for concealing the truth' or 'perpetrating fraud.' Under these circumstances, whatever may be said in criticism of the soundness of a governmental policy of empowering corporations to possess such powers of control one over another, as we have recently had occasion to consider, there is, in our opinion, wanting essential elements to make it proper for the jury to decide the question of whether the agents and officers of the Surety Company were the agents and officers of the Oil Company. National Hotel Co. v. Motley, Tex.Civ.App., 123 S.W.2d 461, and authorities therein cited and discussed."

Professor Ballatine, in his article, "Separate Entity of Parent and Subsidiary Corporations," 14 Cal.Law Rev. 12, 17 (1925), cited with approval in the Berkey case, gives us the following discussion of the matter:

"The mere fact that the parent corporation owns all the stock of the subordinate corporation, or that the same individuals own all the stock in both corporations, does not make them the same concern in law. There must be some ground in addition to mere unity of interest and ownership. Even when two or more corporations are associated together under common control as several branches or departments of a single common enterprise, they are still normally to be regarded as separate and independent legal entities.

"It has been asserted, however, that where stock ownership is resorted to not for the purpose of participating in the affairs of the corporation in the customary and usual manner, but for the purpose of controlling the subsidiary company so that it may be used as a mere adjunct, agency, or instrumentality of the owning company, the court will not permit itself to be blinded by mere corporate form, but will in a proper case disregard the corporate entity and treat the two corporations as one, or at least as responsible for each other." ·

■ Appellant contends in this connection, however, that the ownership of all or substantially all the stock of Consumers by Swift is in violation of the public policy of this State as permitting a foreign corporation with a permit to operate a meat packing business in this State to operate a cottonseed oil mill and gin business in this State. Cited in support of the contention is Art. 7427. This Article is a part of the anti-trust laws of this State. It does not forbid one corporation to own the stock of another. It merely forbids such stock ownership when the result is to create a trust or restraint of trade. Whether Swift is so using its stock ownership and control of Consumers to violate the anti-trust statutes is not involved in this case. The question here presented is whether that ownership of all the stock of Consumers by Swift is per se illegal as being contrary to the public policy of this State, authorizing the State to forfeit the charter of Consumers and the permit of Swift to do business in Texas.

■ No affirmative legislative act condemns such stock ownership. It is common knowledge that during the past fifty years large numbers of foreign corporations have owned stock in Texas corporations. In the Humble case, supra, it was held that the ownership of the controlling stock by a foreign corporation without a permit to do business in Texas, did not amount to doing

business by the foreign corporation in Texas. And in 1925 the Legislature enacted Art. 1533a, Vernon's Ann.Civ.St., which reads as follows:

"Voting stock and participating in management of domestic corporation.—That when any foreign corporation without a permit to do business in this State lawfully owns or may lawfully own or acquire stock in Texas corporation, it shall not be unlawful for such foreign corporation to vote said stock and participate in the management and control of the business and affairs of such Texas corporation, as other stockholders, subject to all laws, rules and regulations governing Texas corporations, and especially subject to the provisions of the Anti-trust Laws of the State of Texas."

■ We think the foregoing act establishes the public policy of this State with respect to ownership of stock by a foreign corporation in a Texas corporation. The Legislature determines such public policy. That it may do so and how it may do so is succinctly stated in 23 Am. Jur., 81, as follows:

"§ 74. Generally.—Each state must determine for itself, by its own legislature, its policy in permitting foreign business corporations to do business in the State. It is within the province of the courts to ascertain and apply the law and the legislative policy, but not to inaugurate a policy. Since the comity involved is not that of the courts but that of the state the judiciary must be guided, in determining the extent to which a foreign corporation shall be recognized and permitted to exercise powers within the state, by the principle and policy adopted by the legislature."

"§ 76. What is Sufficient to Establish Policy Restrictive of Comity.—In the absence of any legislation restricting the business of a foreign corporation, it is the accepted rule that in order to justify a court in sustaining the contention that the corporation's acts or contracts should be declared void as in conflict with the policy of the state or territory, or in concluding that such policy does not permit the corporation to carry on its business or to acquire or to hold real property there, the line of that policy should be very clear and distinct and must be expressed in some affirmative way. The fact that the legislature does not specify the terms on which foreign corporations may do business does not justify the court in refusing to recognize the right of such corporations to do business in the state. That recognition of the foreign corporation would conflict with public policy cannot be inferred from the fact that the legislature of the state has made no provision for the formation of similar corporations, or allows corporations to be formed only under general laws. Assent to the usual laws of comity is shown by long silence on the part of state authorities while foreign corporations are doing business in the state, and must ordinarily be presumed from silent acquiescence on the part of the state or its failure to enact legislation restrictive thereof."

■ Having held that the stock ownership of Consumers by Swift is not per se unlawful, the second question arises: Does the evidence show that Swift through such stock ownership actually dominated and controlled Consumers so as to be in fact itself engaged in the cottonseed oil mill and gin business in Texas without a permit to do so? The trial court found that it was not so engaged, and we hold that the evidence adduced sustains such finding. Stated differently, the trial court held that the separate corporate identity of Consumers had not been ignored by Swift under the facts adduced on the trial of the case.

■ Other than the foregoing general rule for determining when a corporation becomes through stock ownership the agent or representative of such owner, no specific or mechanical rule has been cited or found by us as to exactly what condition must exist to warrant a court in holding that one corporation has become the mere agent or representative of another corporation. Just when a corporation will be regarded as the adjunct, creature, instrumentality, device, stooge, or dummy of another corporation is usually held to be a question of fact in each case. As above stated the general rule is that the separate corporate entity of corporations will be observed by the courts, even though one may dominate or control another, or may treat it as a mere department, instrumentality, agency, etc.; and courts will disregard the separate legal identities of the corporations only when one is used to defeat public convenience, justify wrongs, protect fraud or crime of the other. Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599; Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255; Texas Pacific Coal & Oil Co. v.

Smith, Tex.Civ.App., 130 S.W.2d 425, dis. cor. judgment; State v. Humble Oil & Refining Co., Tex.Civ.App., 263 S.W. 319 (error ,ref.). These cases discuss at length proper methods or standards of handling relations between a parent and a subsidiary corporation so as to prevent their separate corporate identities from being disregarded by the courts. After reviewing particularly the Berkey case, Mr. Justice Douglas, before going on the bench, wrote an article for 39 Yale L.J. 193, in which such methods or standards are summarized as follows:

"The observance of the following four standards will keep the business units from being treated as assimilated: (1) A separate financial unit should be set up and maintained. That unit should be sufficiently financed so as to carry the normal strains upon it. The risks attendant on the conduct of a business of that type can roughly be averaged and that average met. (2) The day to day business of the two units should be kept separate. Normally each process can be tagged so as to identify it with the activity of one unit or with that of the other. Occasionally such tagging will be difficult in a case where the two businesses are merely units in a line of production. But such separation as the technology of the business permits should be sufficient. And in addition the financial and business records of the two units should be separately kept. (3) The formal barriers between the two management structures should be maintained. The ritual of separate meetings should be religiously observed. The activities of the individuals serving on the two boards can be tagged so that the individuals qua directors of the subsidiary can always be distinguished from the same individuals qua directors of the parent. Such tagging is not pure fiction. It draws the line that keeps the dual capacities separate and distinct. It conforms to the habit of thought which accepts the fact of dual capacity but which demands a separation of conduct so that each act may be clearly categorized. Separate meetings of the boards are sufficient. The same problem arises in connection with the officers. And the same solution suggests itself. A man may not be indiscriminately one officer or another. The observance of the niceties of business efficiency are normally sufficient. Such demands are not exacting. They merely suffice to keep the record of the business affairs of the two units from becoming hopelessly intermingled. (4) The two units should not be represented as being one unit. Those with whom they come in contact should be kept sufficiently informed of their separate identities."

When the foregoing four methods or standards are applied they sustain the finding of fact by the trial court that Swift has not ignored the separate corporate entity of Consumers. Also the finding of fact that Swift has not so used its stock ownership of Consumers as to make it the mere agent, representative, adjunct, device, stooge, or dummy through which Swift in fact operates the cottonseed oil mill and gin business in Texas without a permit to do so. The evidence sufficiently established the following facts and conditions with respect to the four methods or standards for keeping the corporations separate:

1. Prior to the formation of Consumers under the consent decree or court judgment in 1938, Swift owned the cottonseed oil mill and gin properties involved. Swift conveyed all the properties as a going concern theretofore operated under the trusteeship of the court for twenty-three years, the decree providing that Swift could own all the stock of Consumers. After its formation Consumers set up its separate financial unit; and that it has been adequately financed by the use of the properties so conveyed to it is not questioned.

2. The day to day business of the two corporations has been kept on the separate records and books of each corporation; the business of Consumers originating through its Texas employees, all residing in Texas and having authority to act for Consumers.

3. The directors' meetings of the two corporations have been continuously separately held, and all actions taken have been recorded in the respective separately kept minute books of each corporation. When an officer of Consumers, who was also an officer of Swift, dealt with Swift, he dealt with some other officer of Swift acting as the representative of Swift.

4. The two corporations have never been represented to the public as being one unit. The two corporations have entirely different names and are engaged in entirely different businesses, and there was no proof that the public dealing with the corporations had been misled into the belief that they were one and the same, or that one was the mere agent, device, etc., of the other.

The acts of domination or control by Swift over Consumers were no greater than, if as great or complete as, were the acts of domination or control by the parent corporation over the subsidiary corporation in each the Berkey, Cudahy, and the first cited Smith case, supra. Space forbids a detailed statement of the facts in either of these cases. Suffice it to find here the comparable facts in the instant case sustaining the finding of the trial court that Swift has not through its stock ownership of Consumers made the latter the mere agent, stooge or dummy of Swift so as to render Swift in fact doing the cottonseed oil mill and gin business in Texas, without having a permit to do so.

Prior to the formation of Consumers under the 1938 court decree, the properties involved were held by Consumers Cotton Oil Mill Company a Massachusetts trust, all of the beneficial shares being owned by Swift. O. E. Jones, an officer of Swift, became president of the Massachusetts trust in 1931, while the properties were being operated under the court trusteeship. He made all decisions and policies affecting the operation of the properties. The actual conduct of the business of the trust was through a General Manager at Dallas, and mill managers in Texas, who carried on the business, determining the purchases of cottonseed and sales of products. Jones became the first president of Consumers after its formation under the court decree in 1938. Later, P. M. Jarvis, who had been vice-president, became president, succeeding Jones for the remainder of the time here involved. During this period each president testified that Consumers' business was conducted by its own Texas employees without interference of Swift, and that such employees exercised final authority in purchasing cottonseed and selling products for Consumers, and fixed the prices therefor.

Swift maintains in connection with its meat packing business in Illinois numerous specialized departments dealing with accounting, credit, traffic, purchasing, research, taxation and others. After Jones became president of Consumers he made an arrangement with Swift whereby, for a consideration which was reasonable, or not shown to be excessive, to use the services of these various departments of Swift. Jones acted for Consumers and other officers acted for Swift in making these arrangements, and Jones has continued them

since he became president of Consumers. Jones and Jarvis each testified that they thought the arrangements were for the best interest of Consumers and that they were not made under any compulsion of Swift. Each further testified that such services were necessary and beneficial, and that the employees of Consumers were instructed to seek and follow the advice of Swift's service departments. The services so procured related to matters of accounting, public relations, credit, purchasing automobile tires, taxation, reasonable business methods and practices. The compensation paid Swift for these services was based in some instances upon cost to Swift, and in other instances where joint employees of the two corporations were used, Consumers paid part and Swift paid part of their salaries direct to such employees. The directors' meetings of both concerns were held in Chicago, each being separately held and recorded in the separate minutes of each concern. The president of the Texas corporation is vice-president of Swift, and a majority of the officers and directors of Consumers are officers and employees of Swift, and reside in Chicago.

Some two thousand exhibits were introduced by the State, most of which were taken from the offices of the General Manager in Dallas, and consisted of ukases, directives, and letters between the Texas officers and employees with the various service departments of Swift. They relate to many detail operations of Consumers and advise as to how to conduct its business, all of which was both sought by the employees of Consumers and followed by them. The witnesses testified that Swift was paid reasonable compensation for these services, and that they were beneficial to Consumers; and that the arrangements were mutually advantageous because less expensive to Consumers resulting in larger stock dividends to Swift.

The foregoing facts are similar to the facts in the Cudahy, the Smith, and the Berkey cases. In the latter Mr. Justice Cardozo said [244 N.Y. 84, 155 N.E. 61]:

"The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the parent corporation operates a business through

a subsidiary which is characterized as an 'alias' or a 'dummy.' All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation. Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice. Ballantine, Parent and Subsidiary Corporations, 14 Cal.Law Review, 12, 18, 19, 20. * * * We find in the case at hand neither agency on the one hand, nor, on the other, abuse to be corrected by the implication of a merger."

The third question: Is the judgment or judgments plead by Swift res adjudicata of the question of whether the ownership of all of the stock of Consumers by Swift is lawful? We answer the question in the affirmative.

On August 3, 1938, an order was entered in cause No. 31,947, State of Texas v. Swift and Company et al., by the 26th District Court of Travis County, authorizing Swift to form a Texas corporation, to convey to such corporation the cottonseed oil mills and gins owned by Swift and involved in that suit, and to own all of the stock of such corporation. This arrangement was made.

As hereinabove stated said cause No. 31,947 was filed in 1915, the State alleging that Swift and the others named had formed conspiracies to violate the anti-trust laws and in restraint of trade, by acquiring certain cottonseed oil mills and gins, including the ones here involved, and had thereby misused their means and assets, and had abused their corporate privileges and permits to do business in Texas. A compromise and settlement of the case was made and a consent judgment was entered in the case on December 14, 1915. The consent judgment imposed penalties on the defendants and enjoined them from thereafter jointly owning or operating any of the cottonseed oil mill or gin properties involved. Swift was enjoined from using its means and assets in the ownership or operation of cottonseed oil mills and gins; except its group, involved in the suit, was to be operated under supervision of a trusteeship provided for in the judgment, "to insure the lawful management of" such properties "until such time as the properties * * * can be sold at reasonable price under order of the court." The con-

sent decree further provided that the court should "retain jurisdiction of the cause with full power and authority to enter such orders, decrees and judgments as may be necessary or proper to effectuate the purposes expressed," and "to effectuate the purposes expressed by this decree and by the agreement of the parties upon which this decree is predicated, particularly the purpose to secure the independent management of said * * * properties * * * and the sale thereof at reasonable prices," and so as "to preserve the properties * * * as active factors and independent competitive properties with all other properties in the cottonseed oil trade in Texas."

As hereinabove detailed, the facts showed that the Swift mill and gin properties could not be sold in compliance with the consent decree so as to preserve them as independent competitive properties with other properties in Texas; and the suggestion was made by the court's trustee of the properties that the remainder of the consent decree of December 14, 1915, could be complied with by Swift forming a Texas corporation and conveying to it all of the mill and gin properties, Swift to own all of the stock of such corporation. By its motion filed in said cause No. 31,947, Swift set up the fact that the properties could not be sold as active factors and independent competitive properties, as shown by reports of the trustees during the twenty-three years of operation under the provisions thereof by the trustees; that Swift had so organized and reorganized its oil mill and gin properties that it would not violate any laws; and that Swift be allowed to organize a corporation and convey the unsold properties to it; and that such corporation acquire other mills that were about to be dismantled; and that Swift be allowed to own all of the stock of such corporation. Prayer was that the consent judgment be accordingly so modified. The Attorney General answered that the court had no jurisdiction to make the requested modification of the consent decree, and denied the allegations of Swift.

After a hearing of the aforementioned issues the court ordered that the consent decree be amended so as to set aside, annul and terminate the provision thereof enjoining and restraining Swift from using its means and assets in the ownership and operation of the mill and gin properties; that the consent decree be modified and reformed to permit Swift to organize a Texas

corporation to which the properties might be conveyed, and to permit Swift to own all of the capital stock of such corporation; all of which was done.

The State contends that the court had no jurisdiction to so modify its decree of December 14, 1915, after the adjournment of the term at which it was rendered.

We construe the amendment of the original decree of 1915 as being merely an additional or necessary provision or method for making the sale of the properties involved as provided by the original decree. The original decree required the operation of the properties under supervision of a trustee until such time as they could be sold for a reasonable price and as independent competitive properties in the cottonseed oil mill business in Texas. After twenty-three years of such operation of the properties the character of sale provided for in the original judgment had not and could not be made. The 1915 decree reserved in the court jurisdiction and authority to carry out the agreed settlement of the case as contained in the consent judgment, including jurisdiction to effectuate the sale of the properties in the manner stated and for the purposes stated. The portions of the decree authorizing Swift to form the Texas corporation, to convey the properties to it, and to own its capital stock did not authorize Swift to engage in the cottonseed oil mill and gin business; but it did authorize the effecting of a sale of the properties by means of forming a corporation and conveying the properties to it. The organization of such corporation and the conveyance of the properties to it were incidental to the reserved jurisdiction and authority of the court to effectuate the sale of the properties under the order of the original decree. In so authorizing the conveyance of the properties to the corporation we think the court necessarily determined the conveyance and the stock ownership of Swift to be lawful; and that the action so taken merely carried out the purpose of the original decree in accordance with the jurisdiction reserved by the court under the terms of the original decree, which reserved to the court the authority to approve any sale made of any of the properties.

The facts and original decree in the instant case are analogous to the facts and decree in the case of United States & Mexican Trust Co. v. Young, 46 Tex.Civ.App. 117, 101 S.W. 1045, 1048, (writ denied). In that case the court established a lien and entered judgment foreclosing it, but retained the right to suspend its enforcement if certain circumstances demanded. The court also retained jurisdiction through receivership. Appellant attacked the judgment postponing the sale of the property, because the term at which the original order of sale had ended. The court overruled the contention as follows:

"Ordinarily courts lose jurisdiction of a case finally disposed of when the term of court adjourns. But in the case at bar the receivership had not been wound up and the court still retained jurisdiction of the case. It is true appellant's lien had been established and a judgment of foreclosure had; but the court still retained the right to suspend the enforcement thereof, if circumstances demanded. The court never lost control over the order of sale. The order required the property to be sold for not less than $500,000. The property was offered for sale, but no bid was made; consequently no sale. Had a sale been made, it would have been necessary that it be confirmed by the court before it would have become effective."

See also Hubbard v. Trinity State Bank, Tex.Civ.App., 48 S.W.2d 379. And whether the court correctly or erroneously determined the questions in the order of August 3, 1938, is not important to the application of the doctrine of res adjudicata. It had jurisdiction to determine the issues presented by the pleadings. Security Trust Co. v. Lipscomb Co., Tex.Sup., 180 S.W. 2d 151.

Nor is the contention of State that there was a want of identity of parties and subject-matters so as to inhibit the order of August 3, 1938, being res adjudicata of the issue of whether the stock ownership by Swift of Consumers is lawful. The subject-matter is identical. The court was petitioned to authorize Swift to organize Consumers, to convey to it the same properties, and to own the stock of Consumers. The question first presented here is whether such stock ownership is lawful. Some of the parties to the original proceeding are not parties here, but they are not adversary parties to the question of the legality of the ownership of the stock by Swift. The State and Swift are the adversary parties in both suits as to whether Swift's ownership of the stock was lawful. Russell v. Farquhar, 55 Tex. 355. Nor

does the fact that Consumers, which was not organized either at the time of the original decree in 1915 or at the time of the order of 1938 authorizing its formation, was not a party to either proceeding prevent the application of the doctrine of res adjudicata. White v. Burch, Tex.Civ.App., 33 S.W.2d 512.

The judgment, of course, is not res adjudicata of the second question herein decided of whether since the formation of Consumers and the ownership of all its stock by Swift, as authorized by the court decree, Swift has so dominated and controlled Consumers as to make it the mere agent, device, or dummy through which Swift does business, or to make Swift in fact engaged in the cottonseed oil mill and gin business in Texas without a permit to do so. We have determined that issue against the State on the facts as sustaining the findings of the trial court thereon.

Nor do we pass upon or consider any question of whether Swift through its stock ownership and domination and control over Consumers is violating the anti-trust laws by so using its means and assets. That issue is not involved in this proceeding.

The foregoing disposes of the controlling questions in the case; and other points urged by the parties have been considered and are overruled.

The judgment of the trial court is affirmed.

Affirmed.