**EDWARDS COMPANY, INC.,**
**Plaintiff-Appellant,**

v.

**MONOGRAM INDUSTRIES, INC., Mono-tronics, Inc. and Entronic Company,**
**Defendants-Appellees.**

No. 82–2019.

United States Court of Appeals,
Fifth Circuit.

March 21, 1983.

Larry D. Knippa, Houston, Tex., for plaintiff-appellant.

Dan Matthews, Houston, Tex., for Monogram Industries, Inc.

Thomas Collins, Houston, Tex., for Monotronics, Inc., et al.

Before JOHNSON, WILLIAMS and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case constitutes an attempt by Edwards Company, Inc.,[1] to pierce the corporate veil of Monotronics, Inc., in order to hold its parent corporation, Monogram, Inc.,[2] liable for $352,000 in debts owed to Edwards.[3]

After a nonjury trial, the lower court, applying Texas law in this diversity case, refused to pierce Monotronics's veil. It held that in order to pierce the corporate veil in Texas a showing of fraud, illegality or injustice is required and that a showing of domination or control is insufficient.

Our interpretation of Texas law, as applied to the facts of this case, differs. In our view, where, as here, the subsidiary has no real corporate existence but serves as a mere conduit for the parent, Texas law permits a creditor to go against the parent for debts incurred. We therefore reverse and remand this case.

## I.

Once upon a time, there was a corporation in Earth City, Missouri, known as Entronic Corporation. Entronic produced and sold smoke detectors or alarms.

In 1977 Monogram decided that Entronic would be a good acquisition. Entronic had been in existence for several years, consistently showing a profit. In 1976 it had a sales volume of $9 million. By June 30, 1977, it had pre-tax earnings of approximately $1 million and a net worth of between $800–900,000. The future for Entronics was promising, especially considering that it had strong sales in the "captured market," i.e., where government legislation required installation of smoke detectors.

Monogram, an acquisition-minded company, decided in March or April of 1977 to purchase Entronic Corporation. It did so by creating a wholly owned subsidiary, Monotronics,[4] which bought seventy-five percent of the Entronic stock, dissolved Entronic Corporation and reformed it as Entronic Company. Monotronics comprised the sole general partner, and the former twenty-five percent shareholders in the corporation were limited partners with twenty-five percent ownership.

Several reasons existed for Monogram's decision to form Monotronics as a subsidiary-intermediary between it and Entronic Company. The smoke detector industry was a volatile, high-technology industry, and could "go up in smoke" at any moment, leaving creditors to be paid. Products liability was also a concern.[5] Taxes were also a concern in that, if Monogram were the general partner, both Texas and Missouri would tax all of Monogram's revenues.

So in May 1977 Monotronics was incorporated, and in July 1977 control of Entronic Corporation was purchased for $1.579 mil-

---

1. Edwards is a New York corporation with principal offices in Connecticut. Edwards is one of over twenty subsidiaries of General Signal Corporation.

2. Monogram is a Delaware corporation with principal offices in California. Monogram is a conglomerate with six or seven subsidiaries. Its primary business is the manufacturing and sale of electrical and metal products. In 1980 it reported sales of some $260 million.

3. Monotronics did not participate in the full trial. An interlocutory judgment was taken against Monotronics at the outset of the trial and was included in the Final Judgment. Because Monotronics has assets of only $10,000, the trial continued apace.

4. Monotronics was formed as a Missouri corporation and is licensed to do business in Missouri and Texas.

5. Entronic Company was unable to obtain products liability insurance, and Monogram added such insurance onto its master policy.

lion. An additional $251,000 "capital" was put into Monotronics by Monogram.[6]

Business remained strong for Entronic Company for several months. During one month shortly following acquisition sales were somewhere around $1.7–1.8 million. In March 1978 sales were $1.6 million. In April, however, sales fell to $1 million. By May sales had fallen to $340,000 with losses totalling $187,000. This precipitate decline in profits is attributed to several related factors: General Electric "dumping" alarms on the market at greatly reduced prices; poor quality control and a high rate of detectors returned to the plant; and difficulties in collecting accounts receivable.

Despite numerous and repeated efforts to salvage the situation, sales continued to decline, losses mounted,[7] and in February 1979 Monotronics sold its interest in Entronic to a new corporation, Newco W.A.H., headed by the former president of Entronic, Al Hays. Newco promptly filed a Chapter 11 bankruptcy proceeding in the Southern District of Texas. At the time of the trial Monotronics was not conducting any business and had total assets of about $10,000.

The largest outstanding creditor was Edwards. Edwards manufactures the "midihorns" which sound the alarm in the smoke detectors. Edwards had sold horns to Entronic Company in the fall of 1977 and, after considerable difficulty and after putting a credit hold on Entronic, had been paid. Additional sales had been made between March 23, 1978, and June 30, 1978, of $352,247.86-worth of alarms specially designed for the Entronic smoke detectors. Payment was not made for this extended credit, and this suit was brought.

## II.

As stated, Monotronics was wholly owned by Monogram, with Monogram holding 100 percent of the outstanding shares in Monotronics. Monotronics's sole reason for existing was as general partner of Entronic Company. It had no other function.

All of the officers and directors of Monotronics were either officers or directors of Monogram. None of the Monotronics officers and directors lived in either Missouri or Texas, which were the sites of the smoke detector business of Entronic Company. The chairman of the board and chief executive officer of Monogram was also president of Monotronics. The treasurer and assistant treasurer of Monogram occupied similar positions with Monotronics.

When Monotronics acquired Entronic Corporation, Al Hays was Entronic's president. He remained as chief executive officer of Entronic Company, but he was never an employee, officer or director of Monotronics or Monogram. Hays was fired in October 1978 and replaced by Coy Powers, a Monogram employee from Venice, California. When Monotronics sold its general partnership in February 1979, it sold to Hays's newly formed corporation, Newco, which promptly filed for bankruptcy.

Monotronics never had a payroll, a telephone or office space. It did not have any stationery of its own until September 1978, and this was paid for by Monogram. One of the bank accounts in which its "capital" was deposited had no printed checks. The office space and telephones which Monotronics used were Monogram's at 100 Wilshire Boulevard in Santa Monica, California. This was Monotronics's headquarters, although Monotronics was never licensed to do business in California.

No one from Monotronics ever actually exercised day-to-day control over Entronic's operations. No one ever scheduled production, ordered supplies or marketed Entronic's smoke alarms. All of these "details" were performed by Entronic employees.

All of the bookkeeping for Monotronics was handled by Monogram. No charges were assessed for this bookkeeping. Monotronics's federal income tax returns were combined with Monogram's. Monogram's SEC and annual reports to stockholders stated that it was in the smoke detector business.

---

6. This "capital" is discussed *infra* at note 8.

7. For the fiscal year ending June 30, 1978, Monotronics showed a loss of $1,033,821.

Despite the initial infusion of $251,000 "capital" into Monotronics, this money lay fallow until Monotronics sold its interest in Entronic.[8] The actual financing mechanism was for Monogram to make direct unsecured loans to Entronic[9] or to line up credit for Entronic.[10] Monotronics was essentially leap-frogged in all these financial matters.

Monogram made numerous payments for accounting, legal and other services rendered to Monotronics and Entronic. These "advances for expenditures" totalled over $273,000 for fiscal 1978 and 1979. Repayment for these advances was not made.

Monogram paid state franchise taxes for Monotronics, patent search fees and filing fees.

Although minutes were kept in Monotronics's name, they were at best inconsistent. For example, in October 1977, when Monotronics formally authorized the borrowing of money from Monogram, over $484,000 in unsecured advances had already been made by Monogram to Entronic. On the other hand, no minutes were taken to record the firing of Al Hays, the move of the entire operation from Missouri to Texas or the doubling of the size of the plant,[11] the hiring of Coy Powers, nor are there any minutes dealing with the severe deterioration of the business or any proposal to recover from that deterioration until November 1978, long after the deterioration had begun.

No effort was ever made to get consent of Entronic Company's limited partners to business decisions concerning Entronic.

When it became apparent that the situation was not salvagable, Monogram devised a number of plans for the impending bankruptcy, including the one which eventually was used (sale to Newco and Al Hays of

8. The $251,000 "capital" apparently was deposited in Bank of America and in Citibank as a "compensating balance," that is, Monogram had Monotronics carry certain balances in order to be able to get prime rate financing. Portions of the money were transferred back and forth between Bank of America and Citibank. The treasurer of Monotronics, who was also Monogram's treasurer, was not aware of the existence of these funds.

When Monogram had Monotronics sell its general partnership to Newco, a contract was entered between Monogram and Monotronics and Newco. Out of the $251,000 $200,000 was "loaned" to the newly formed Entronic and a "release of the general unsecured creditors of all claims against Monogram or Monotronics arising out of any transaction with Entronic" was included in the contract. After a contest in bankruptcy court, this release was defeated. The $200,000 apparently remained with the new Entronic, which subsequently was liquidated.

Another $20,000 or $30,000 was paid to the new Entronic's bankruptcy lawyers. Another $10,000 cash remained with Monotronics as its only asset. The remaining money out of the $251,000 has not been accounted for in the record.

9. From September 1977 to July 1978 Monogram made ten unsecured loans to Entronic totalling $1,393,968.28. Five loans were for operating capital, four loans were for expansion of the Texas facility and one was for payment to a shareholder in Entronic Corporation. Promissory notes were given Monogram by Entronic in return.

10. Essentially, Monogram was the guarantor for all loans and letters of credit obtained to finance the operation and expansion of Entronic. Neither Entronic nor Monotronics was able to obtain financing without Monogram's guarantee. The credit extended by Edwards is a notable exception.

11. Monogram did record the planned expansion and financing arrangement in *its* minutes of May 11, 1978. Referring to Entronic as "this corporation's affiliated partnership," with no mention of Monotronics, Monogram proposed that another subsidiary, Ring Brothers, actually purchase the Texas property, which Entronic had been leasing with an option to purchase. Ring would then re-lease it to Entronic. Ring Brothers had previously had some property condemned and needed to reinvest the proceeds from that condemnation in order to avoid tax liability.

A proposed financing arrangement would have involved an $850,000 permanent loan (for which a commitment was in fact made) from BA Mortgage and International Realty Corporation, with Monogram actually obtaining the loan. Out of the loan, Ring Brothers was to pay a portion for the property and a portion to Entronic for Entronic's sale to Ring of its option to purchase. Entronic in turn would have paid this money to Monogram to reduce the loans made by it.

The transaction, which was not discussed in Monotronics's minutes, never occurred due to the continued decline and eventual collapse of Entronic.

Monotronics's interest; the $200,000 loan; and attempted release of Monogram/Monotronics from debts owed to general unsecured creditors). One plan would have involved obtaining agreement from ninety-five percent of the creditors for relinquishment of their claims in exchange for payment by Monogram of fifty cents "on the dollar." The high percentage of creditor agreement to the plan was considered necessary because Monogram felt that those creditors who did not agree could thereafter go against Monogram for the debts. As the chairman and chief executive officer of Monogram stated: "[A]t that point Monogram would be in to such an extent that there would be, as a practical matter . . . they'd have no choice but to pay."

### III.

As stated, Edwards had sold its "midi-horns" to Entronic in the fall of 1977, unaware of the entry of Monogram/Monotronics on the scene. Although it had difficulty receiving payment at that time, its claims were eventually satisfied.

Edwards learned of Monogram's involvement with Entronic in December 1977 when it obtained a Dun & Bradstreet report dated June 2, 1977, which announced the prospective acquisition by Monogram. No mention of Monotronics or of any subsidiary involvement was contained in the report.[12]

According to testimony at trial, Edwards did not learn of Monotronics's existence until September 1978. It learned of Monotronics either by word-of-mouth at a creditors' meeting in Houston, Texas, on September 8, 1978, or from a second Dun & Bradstreet report dated September 22, 1978.

All of Edwards's dealings had been concluded as of June 30, 1978, when it had sent its last shipment of "midi-horns." During the period March 23, 1978, until June 30, 1978, Edwards made seventeen shipments to Entronic.

12. Edwards's sales network in California had heard rumors of the takeover prior to Ed-

### IV.

We are presented essentially with two issues:

A.) Whether, under Texas law, a finding of fraud, injustice or some form of bad-faith dealing is required before a court may pierce the corporate veil, or whether it is sufficient to show that a subsidiary existed as a mere agent or conduit of the parent.

B.) Whether, if being a mere agent or conduit allows piercing of the corporate veil, Monotronics was such a mere agent or conduit of Monogram's.

#### A. Fraud versus Agency

At the outset, we note that we do not find any fraud, undercapitalization, or misplaced reliance involved here. "Raw" fraud, such as draining of corporate assets by an individual, will obviously call for disregard of the corporate existence. Similarly, undercapitalization to such an extent as to indicate an absence of real intent to conduct business also may call for disregard of the corporate existence. *Holmes v. Clow*, 533 S.W.2d 99, 102 (Tex.Civ.App. 1976). Courts will also pierce the corporate veil where it appears that a creditor has been misled in some manner into reliance upon the parent corporation for the subsidiary's debts. *Hanson v. Dal-Mac Constr. Co.*, 554 S.W.2d 712, 719 (Tex.Civ.App.1977). This, of course, is but another form of fraud.

The only aspect of this case which strikes us as even hinting faintly of fraud concerns the $251,000 "capital" which sat unused in bank accounts until $200,000 of it went to Newco in apparent exchange for an attempted release of Monotronics from Entronic's debts. The exact disposition of this so-called capital is still somewhat unclear. As far as the record reveals, however, it was not used to pay off creditors. Edwards would have us read more than is apparent into the fact that this money was never actually used to fund Entronic Company's day-to-day operation. But that is a question separate from that of fraud.

wards's obtaining the Dun & Bradstreet report.

Nor do we consider Monotronics undercapitalized vis-a-vis Entronic. Monogram wound up this fiasco having poured over $2 million into Entronic.[13] The unsecured "loans" to Entronic, while not the normal form of capitalization, certainly constituted a good-faith effort by Monogram to keep the business going.[14] Entronic was viable, real and well-financed. There was no "sham" or "front" as far as Entronic was concerned.

Edwards was not misled into extending credit because of any representation made by Monogram. As stated, Edwards did not learn of Monogram's July 1977 acquisition until December 1977, after Edwards had experienced credit problems with Entronics in the fall of 1977. It did not learn of Monotronics's existence until the following September, over one month after the last shipment to Entronic. The shipments made in the spring and summer of 1978 were made without knowledge of Monotronics's existence, but they also were made without any assurance or representation from Monogram that it would stand for Entronic's debts.[15] No evidence was presented to indicate misplaced reliance on misleading conduct by Monogram. What the facts essentially reveal in this regard is that Edwards continued to do business with Entronic with the good-faith expectation that it would fulfill its contractual duties to pay for goods received.

Absent "compelling factors" such as these, we turn to the issue of whether the corporate veil in Texas may be pierced solely upon a showing that a subsidiary corporation served as a mere tool or agent for the parent.

The Texas case law setting forth the prerequisites for piercing the corporate veil is somewhat confusing. In some cases the Texas courts have stated dogmatically that domination and control of a subsidiary corporation by its parent is not sufficient to allow disregard of their separate existence but that fraud or bad-faith dealing is required. *See, e.g., Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises,* 615 S.W.2d 258, 263 (Tex.Civ.App.1981); *Norton v. Integral Corp.,* 584 S.W.2d 932, 935 (Tex. Civ.App.1979). In other cases, however, the courts have allowed the corporate veil to be pierced when, absent any showing of fraud, it is shown that the subsidiary is a mere agent or conduit of the parent. *See, e.g. Jetty, Inc. v. Hall-McGuff Architects,* 595 S.W.2d 918, 921 (Tex.Civ.App.1980); *Allright Texas, Inc. v. Simmons,* 501 S.W.2d 145 (Tex.Civ.App.1973); *Texas Pacific Coal & Oil v. Smith,* 130 S.W.2d 425, 428–29 (Tex.Civ.App.1939). Indeed, language frequently can be found within a single case coming down on both sides of this issue. Consequently, we find the parties relying on the same cases here.

■ Despite the seeming confusion in the Texas cases on point, an analysis of these cases convinces us that fraud is not a prerequisite to piercing the corporate veil under "alter ego" or "instrumentality" principles. Where the subsidiary corporation has no separate existence apart from the parent but is the mere conduit, tool, front or dummy for the parent, Texas courts will hold the parent liable.

■ We start with the proposition that the burden rests on the party seeking to pierce the veil. *Coryell v. Phipps,* 128 F.2d 702, 704 (5th Cir.1942), *aff'd.,* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943). The burden is a significant one, and the parent

---

**13.** In its income tax returns, Monogram has claimed losses of $1,664,000 resulting from the venture.

**14.** In *Tigrett v. Pointer,* 580 S.W.2d 375 at 383 (Tex.Civ.App.1979), the court stated that "In equity, a large indebtedness in favor of a dominant stockholder may be treated as an advance of capital...."

**15.** Although at one point during the trial Edwards's chief financial officer stated that Edwards re-extended "them," *i.e.,* Entronic, credit based on the Dun & Bradstreet report, this was refuted somewhat by his subsequent acknowledgement that as a matter of course, if the acquiring firm intends to stand for the debts of its acquisition, the Dun & Bradstreet report will indicate that a general guarantee has been provided. The report contained no such guarantee.

corporation's separate existence will be given effect "unless there are circumstances justifying disregard of the corporate entity. . . ." *Matter of Crome Plate, Inc.,* 614 F.2d 990, 996 (5th Cir.1980).

Those circumstances have been spelled out in numerous Texas cases. In *Minchen v. Van Trease,* 425 S.W.2d 435, 437 (Tex. Civ.App.1968), the court enumerated seven factual circumstances which will justify piercing of the corporate veil.

> While Texas courts may be somewhat more lenient than those of other jurisdictions in disregarding the corporate entity, the reasons for doing so have been well enumerated. These are when the corporation is used to perpetrate a fraud, to evade an existing legal obligation, to achieve or perpetrate a monopoly, to protect a crime, to justify a wrong, to circumvent a statute, and when one corporation exists as a mere tool or business conduit of another corporation.[16]

It would appear, based on this oft-repeated inclusion of agency as a factor which will justify piercing the corporate veil, that fraud is not required before there can be such piercing. In *State v. Swift,* 187 S.W.2d 127, 133 (Tex.Civ.App.1945), however, the court stated:

> [N]o specific or mechanical rule has been cited or found by us as to exactly what conditions must exist to warrant a court in holding that one corporation has become the mere agent or representative of another corporation. Just when a corporation will be regarded as the adjunct, creature, instrumentality, device, stooge, or dummy of another corporation is usually held to be a question of fact in each case. As above stated, the general rule is that the separate corporate entity of corporations will be observed, by the courts, even though one may dominate or control the other, or may treat it as a mere department, instrumentality, agency, etc.; and courts will disregard this sepa-

rate legal identities of the corporations only when one is used to defeat public convenience, justify wrongs, protect fraud or crime of the other.

Even in the face of this strong language, numerous Texas cases have pierced the corporate veil absent a showing of fraud.

In *Jetty, Inc. v. Hall-McGuff Architects,* 595 S.W.2d 918 (Tex.Civ.App.1980), Jetty, a wholly owned subsidiary of Jetty-Fagg, Inc., contracted with McGuff for the preparation by McGuff of architectural plans for a Jetty, Inc., office building. Because of design changes agreed to by Mr. Jetty, who was president of both the parent and subsidiary corporations, the architectural plans were never actually used. Jetty, Inc. refused to pay under the contract. Citing *Gentry v. Credit Plan Corp.,* 528 S.W.2d 571, 573 (Tex.1975), the court held that Jetty had breached the contract and upheld the award against the parent corporation.

> Jetty, Inc. is a wholly owned subsidiary of Jetty-Fagg, Inc. with a complete unity of officers and directors. All work done by Hall-McGuff was paid for by Jetty-Fagg. Jetty, Inc. was also a minimally capitalized corporation that had not engaged in any business up to that time. Further, the project manager for the project, Mr. Beggs, believed that the project was a Jetty-Fagg project rather than a Jetty, Inc. project. All of the decision made on behalf of Jetty, Inc. were made by officers of Jetty-Fagg. Thus, there is sufficient evidence to hold that Jetty, Inc. is a mere tool or business conduit of Jetty-Fagg.

595 S.W.2d at 921. The court's decision contained no discussion of fraud or injustice.

In *Tigrett v. Pointer,* 580 S.W.2d 375 (Tex.Civ.App.1979) (on rehearing), the court was primarily concerned with the personal liability of the sole stockholder of several corporations in a garnishment proceeding. The court found that the sole stockholder

---

**16.** *See also Vallone v. Vallone,* 618 S.W.2d 820, 824 (Tex.Civ.App.1981); *Wolf v. Little John Corp.,* 585 S.W.2d 774, 778 (Tex.Civ.App.1979); *Roylex, Inv. v. Langson Bros. Constr. Co., Inc.,* 585 S.W.2d 768, 771 (Tex.Civ.App.1979); *Hicks v. Wright,* 564 S.W.2d 785, 796 (Tex.Civ.App. 1978).

had acted in bad faith in transferring the corporate assets to himself as a preferred creditor when the corporation had, for all practical purposes, become moribund. On rehearing, in considering whether the plaintiff could go against the sister corporations for satisfaction of the debt, the court stated:

> In their motion for rehearing appellants raised for the first time the question of plaintiff's standing to attack the separate existence of corporations with which plaintiff has never dealt. We have no difficulty with this question in the case of Heritage Corporation, since, as pointed out in our opinion, it received substantially all of the property of Heritage Building Company and was an integral part of Pointer's scheme to place that company's assets beyond the reach of its creditors. If the relationship between several corporations is such that they constitute a single business enterprise, a creditor may attack the separate identity of each without showing that he dealt with all of them.

580 S.W.2d at 400.

In *National Marine Service, Inc. v. C.J. Thibodeaux and Co.*, 501 F.2d 940 (5th Cir. 1974), this court analyzed Texas law in determining whether a shipyard could recover from the parent corporation for repairs performed upon a vessel owned by a subsidiary of the parent.

The parent corporation, Thibodeaux, had formed one subsidiary corporation, Prairie Company, to get into the ship owning and operating business. Prairie Company was formed because Thibodeaux did not want to compete openly with its customers. Prairie Company, along with Thibodeaux, had an agreement with another corporation, River Gulf, which was owned by yet another Thibodeaux employee. The sole function of River Gulf was to hire out a tug boat which was owned by Prairie Company. An independent contractor, who was a long-time acquaintance of Thibodeaux's president, was hired by River Gulf. A six-month's bareboat charter was prepared between the Prairie Company and River Gulf, requiring a monthly pre-payment of the charter hire of $50 per day. River Gulf never signed the charter, although it claimed that there was oral agreement to this effect. When River Gulf had certain repairs performed upon the tug boat and failed to pay for them, the shipyard which performed the repairs brought action against River Gulf. At that time, however, River Gulf was financially defunct, and a default judgment which was entered proved to be worthless. Subsequently the shipyard brought action against Thibodeaux. The shipyard claimed that River Gulf was a mere alter ego of Prairie Company's and Thibodeaux's and that the repairs had been performed for the benefit of Prairie and Thibodeaux with their knowledge.

Thibodeaux claimed that any finding of liability against a parent corporation requires a showing of fraud on its part. The court rejected that contention: "Although there is no doubt that fraud is a proper matter of concern in suits to disregard corporate fictions, it is not a prerequisite to such a result, especially where there is gross undercapitalization or complete domination of the corporate entity under scrutiny." 501 F.2d at 942.

The court went on to say that "the corporate veil, with which appellants would enrobe River Gulf to give it the semblance of being attired in corporate clothing, was so diaphanous that the district court was well able to see through it. Thus, its conclusions of liability were properly drawn." *Id.* at 943.

Monogram argues that Edwards knowingly dealt with Entronic, did not rely on either Monotronics or Monogram as a guarantor of Entronic's debts, and therefore is estopped from recovering against Monogram. This ignores the fact that during the pertinent period in which Edwards was dealing with Entronic, Entronic was a partnership. As such, it offered no shield against liability to its general partner, *i.e.*, Monotronics.

While misleading conduct and misplaced reliance certainly are grounds for recovery

against the parent corporation,[17] they are not the only grounds for recovery and are separate and distinct from the grounds on which we decide this case. As the district court determined in *Thibodeaux,* the key factor in finding the parent corporation liable was that the debts which the nominal subsidiary incurred were incurred with the parent's " 'actual and constructive knowledge,' " and were for its benefit. 501 F.2d at 942, quoting lower court's opinion. Consistent with this rationale, in *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.,* 483 F.2d 1098, 1106–07 (5th Cir.), modified factually, 490 F.2d 916 (5th Cir. 1973) (discussing Alabama law), we considered the general application of the "instrumentality rule," *i.e.,* alter ego rule, and held that rejection of fraud as a prerequisite for its application

> is the better rule, for the theory of liability under the "instrumentality" doctrine does not rest upon intent to defraud. It is an equitable doctrine that places the burden of the loss upon the party who should be responsible. The basic theory of the "instrumentality" doctrine is the debts of the subservient corporation are in reality the obligations of the dominant corporation.

As the Supreme Court stated in *Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944), "the cases of fraud make up part of that exception [which allows the corporate veil to be pierced], but they do not exhaust it." Our holding in *Krivo* and the Supreme Court's theory of liability in *Anderson v. Abbott* conform to the principles underlying the Texas holdings on point. In *Swift,* 187 S.W.2d at 135, the court quoted with approval the following language:

> "The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mist of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the

parent corporation operates a business through a subsidiary which is characterized as an 'alias' or a 'dummy'. All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation. Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the test of honesty and justice. . . . "

Quoting *Berkey v. Third Av. Ry. Co.,* 244 N.Y. 84, 155 N.E. 58, 61 (N.Y.1926) (Cardozo, J.).

This strikes us as the appropriate, common-sense approach to the question. Where outright fraud or bad faith is proved, of course the corporate veil will be pierced. That is axiomatic. It strikes us as equally axiomatic, however, that where a subsidiary is a mere agent or conduit and has, in fact, no real existence, the courts also may act to pierce the veil. The subsidiary must have some substance, some meat on its bones. The simple rubric of filing charters of incorporation for nonfunctioning subsidiaries will not suffice to insulate parent corporations from liability.

We are not saying that mere "domination" of a subsidiary by a parent may allow piercing of the subsidiary's veil. Of course the parent may dominate the subsidiary. A subsidiary by its nature is ultimately subservient in any case, and domination is the prerogative of the parent. The parent can dictate the direction, the form and the style of the subsidiary. It can hire and fire, create and dissolve. And the subsidiary will still insulate the parent from liabilities incurred by the subsidiary.

But we reiterate that the subsidiary must be more than a corporate charter embellished by a few formal niceties. We cannot, as in the case of the Emperor's new clothes, pretend to see something which does not exist.

---

**17.** *Dunn v. Growers Seed Ass'n,* 620 S.W.2d 233, 237 (Tex.Civ.App.1981).

## B. Monotronics ... Monogram by any other name

Having determined that the corporate veil may be pierced upon a finding that the subsidiary exists as no more than the parent's shadow, we now turn back to the facts of this case.[18] As stated in 1 Hildenbrand, Texas Corporations 43 (1942), "What circumstances will be required in order to make one corporation a mere agent or tool in the hand of another so that the corporate entity will be disregarded, is difficult to determine."[19]

█ The fact that Monogram owned 100 percent of the stock in Monotronics does not, in and of itself, defeat their separate existence. *Walker v. Newgent,* 583 F.2d 163, 167 (5th Cir.1978) (applying Texas law). Nor does the fact that they filed a joint tax return defeat their separate existence. *Matter of Chrome Plate, Inc.,* 614 F.2d at 996 (5th Cir.1980) (applying Texas law). Interlocking officers and directors does not suffice, either. *Bell Oil & Gas,* 431 S.W.2d at 339. Nor will it suffice that one corporation has loaned money to another. *Peterson v. Chicago, Rock Isl. & Pacific Ry. Co.,* 205 U.S. 364, 27 S.Ct. 513, 51 L.Ed. 841 (1907).

What will suffice to defeat that separate existence, however, is a determination that there was no separate existence.[20] As stated in 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 43 at 304–05 (1963):

> The control necessary to invoke what is sometimes called "the instrumentality rule" is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.

This is what is present here. As the appellants aptly put it, Monotronics was just a piece of paper lying in a file cabinet at 100 Wilshire Boulevard in Santa Monica, California.

█ We start with the premise that "Monotronics" did nothing. It did not make a product or sell anything. It was a "general partner," and its only "function" was as general partner for Entronic Company. In reality, of course, Monogram was the partner. When the Monogram/Monotronics officers and directors acted, they acted for Monogram.

Aside from its apparent function as a compensating balance, Monotronics's $251,-000 "capital" was never used for any purpose except as a form of burial insurance. It never went toward salaries, expansion or accounts payable.

The corporate directors and officers of Monotronics were all directors and officers of Monogram. They all stayed in California, except for emergency trips to Texas, while Al Hays and, later, Coy Powers, and the Entronic employees ran the day-to-day business of producing smoke alarms.

One of the most telling factors is the ongoing unsecured "loans" from Monogram directly to Entronic. Monotronics did not even authorize such loans until almost one-half million dollars had already been loaned.

Monogram argues that Monotronics did have substance as well as form. They point to the minutes and to the ledgers upon which the loans, advance payments and other financial transactions were recorded. Just as the failure to observe all corporate

---

18. "[E]ach case involving disregard of the corporate entity must rest upon its own special facts...." *Rosenthal v. Leaseway of Texas, Inc.,* 544 S.W.2d 180, 182 (Tex.Civ.App.1976).

19. See Douglas & Shanks, *Insulation from Liability through Subsidiary Corporations,* 39 YALE L.J. 193 (1929) (setting forth four practices which affiliated businesses should observe

in order to avoid being treated as single enterprise), cited with approval in *Swift,* 187 S.W.2d at 134, and in *Bell Oil & Gas v. Allied Chem. Corp.,* 431 S.W.2d 336, 339–40 (Tex.1968).

20. "In order to disregard the corporate entity, there needs to be a showing that separativeness of functions was not maintained." *Matter of Chrome Plate, Inc.,* 614 F.2d at 996.

formalities will not defeat a corporation,[21] however, neither will observance of a few formalities save a corporation. As stated in *Tigrett*, "Appellees would have us hold that resolutions in corporate minutes and entries in corporate books are effective, like a magic wand, to free the enterprise from the claims of its creditors.... This legal legerdemain should deceive no one." 580 S.W.2d 375.

The instant case stands on essentially the same grounds as *National Marine Service, Inc. v. Thibodeaux,* and *Jetty, Inc. v. Hall-McGuff.* Just as there was no "River Gulf" or "Jetty, Inc.," in those cases, so is there, in reality, no "Monotronics" here. And just as Thibodeaux and Jetty-Fagg stood to benefit from and were at least constructively aware of their subsidiaries' debts, so did Monogram have at least constructive knowledge of and stand to benefit from Entronic's dealings with Edwards.

### V.

So that our opinion today is not misconstrued or expanded beyond its intended holding, we reemphasize the limited scope within which a corporate veil can be pierced under Texas law. When the theory forwarded to support disregard of a subsidiary is that it is a mere conduit, there must be a strong showing, as here, that for all practical purposes the subsidiary existed in name only, with no autonomy or substantive purpose. Mere domination will not satisfy the Texas standards for piercing the veil. Virtually total disregard by the parent of the subsidiary is required before a court applying Texas law may disregard the subsidiary.

Consistent with this opinion, we therefore reverse the decision of the lower court and remand this case for a determination of damages and for a determination of appropriate attorneys' fees under Tex.Stat.Ann. art. 2226 (Vernon 1971).

REVERSED AND REMANDED.

21. *City of El Paso v. Del Norte Golf & Country Club,* 614 S.W.2d 168, 170–71 (Tex.Civ.App. 1980).