NUMBER 13-05-389-CV


 

COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


LUCY VILLAGOMEZ, INDIVIDUALLY, AND

AS REPRESENTATIVE OF THE ESTATE

OF ISMAEL VILLAGOMEZ, DECEASED,

AND FRANCISCO VILLAGOMEZ AND 

MARIA VILLAGOMEZ, Appellants,


v.


ROCKWOOD SPECIALTIES, INC., Appellee.

 


On appeal from the 25th District Court of Gonzales County, Texas


 


O P I N I O N



Before Chief Justice Valdez and Justices Castillo and Garza


Opinion by Justice Garza


 

 Lucy Villagomez, individually and as representative of the estate of Ismael
Villagomez, deceased, Francisco Villagomez and Maria Villagomez (collectively "the
Villagomez family") appeal from the trial court's order granting a special appearance by
Rockwood Specialties, Inc., a foreign corporation whose direct acts and omissions are
alleged to have proximately caused the wrongful death of Mrs. Villagomez's husband,
Ismael Villagomez, who was working in Gonzales, Texas at the time of his death. Because
we hold that Rockwood failed to negate the existence of personal jurisdiction, we reverse
the trial court's order and remand the case for further proceedings consistent with this
opinion. 

I. Background 

 Ismael Villagomez suffered catastrophic burns from direct exposure to massive
amounts of steam while cleaning an empty batching tank. At the time of the accident, Mr.
Villagomez was on-the-job and acting under the direction of his employer, Southern Clay,
Inc., a Texas corporation with its principle place of business in Gonzales, Texas. Although
Mr. Villagomez's injuries were fatal, he did not die immediately. He was alive when
paramedics arrived on the scene. He was later transported to a local hospital, where he
was declared dead. 

 Mr. Villagomez's family subsequently filed suit against Southern Clay, alleging
negligence and gross negligence. The Villagomez family also sued Southern Clay's parent
company, Rockwood Specialties, Inc., a Delaware corporation headquartered in Princeton,
New Jersey. The claims against Rockwood include negligence, gross negligence, and
negligent undertaking. 

 Rockwood made a special appearance before the trial court, arguing that the court
lacked personal jurisdiction to hear any claims against Rockwood because it is an out-of-state corporation lacking minimum contacts with Texas. The trial court granted the special
appearance and the Villagomez family has appealed to this Court. 

II. Standard of Review

Whether a court has personal jurisdiction over a defendant is a question of law. Am.
Type Culture Collection v. Coleman, 83 S.W.3d 801, 805-06 (Tex. 2002). In resolving this
question of law, a trial court must frequently resolve questions of fact. See id. at 806. On
appeal, the trial court's determination to grant or deny a special appearance is subject to
de novo review, but appellate courts may also be called upon to review the trial court's
resolution of a factual dispute. See id. The standard of review applicable on appeal from
the resolution of such factual disputes in a special appearance proceeding was recently
clarified by the Texas Supreme Court in BMC Software: "If a trial court enters an order
denying a special appearance, and the trial court issues findings of fact and conclusions
of law, the appellant may challenge the fact findings on legal and factual sufficiency
grounds." BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002).

In the case at bar, the trial court granted Rockwood's special appearance and later
adopted, word-for-word, virtually all of the 67 proposed findings of fact and 14 proposed
conclusions of law drafted and submitted by Rockwood. The trial court denied extensive
written objections filed by the Villagomez family, including among other numerous, detailed
objections, challenges to the legal and factual sufficiency of the evidence to support the
findings proposed by Rockwood. The court later denied all of the supplemental findings
of fact and conclusions of law submitted and requested by the Villagomez family. 

Following the precedent set by the Texas Supreme Court in BMC Software, the
Villagomez family has appealed virtually all of the trial court's findings of fact on legal and
factual sufficiency grounds. In addition, they have raised challenges to the trial court's
conclusions of law and other substantive issues.

Although a trial court's findings of fact may be challenged for legal and factual
sufficiency, we find problematic the mechanical application of the BMC Software precedent
to the facts of this case. The trial court heard no live testimony; yet, the case is riddled with
factual disputes. Furthermore, many of the trial court's findings of fact cannot be
reconciled with the admitted and uncontested evidence in the record. 

The reporter's record shows that the trial court decided the special appearance by
reviewing a cold record of deposition testimony, affidavits, and other evidence. The hearing
on Rockwood's special appearance was non-evidentiary, and all of the evidence was
admitted by stipulation. The parties presented only legal arguments at the hearing. 

 While this may not have been error, it certainly should affect the amount of
deference given to the trial court's findings of fact on appeal. Compare Tex. R. Civ. P.
120a(3) (permitting "oral testimony" to resolve special appearance) and Michiana Easy
Livin' Country, Inc. v. Holten, 168 S.W.3d 777, 782 (Tex. 2005) (noting that "manner of
[evidence] presentation is discretionary" in special appearances) with Union Carbide Corp.
v. Moye, 798 S.W.2d 792, 794 (Tex. 1990) (Hecht, J. concurring) (contending that trial
courts are "authorized and even obliged by rule 258 to hear live testimony when it is
necessary to resolve issues that cannot be determined on a written record" and then
stating that "proceedings under rule 258 are similar [in that regard] to those under rule
120a").

For instance, the trial court's findings could not have been based on evaluations of
credibility or demeanor. See Union Carbide, 798 S.W.2d at 798 (Gonzalez, J. dissenting)
("It is difficult, if not impossible, for the trial judge to evaluate the credibility of the witnesses
and the weight to be given their testimony from reading the cold record. The importance
of the issues at stake and the difficulty of adjudication by reading the record, require that
the parties have the right to a hearing in open court."). Indeed, there is no possibility the
trial court could have used any of its unique fact-finding functions to resolve conflicts in the
evidence, as the trial court did not occupy its fact-finding position at the hearing on the
special appearance. Although a court which holds an evidentiary hearing and acts as the
finder of fact is owed special deference because of its unique position to hear live
testimony and resolve conflicts in the evidence, a court that issues findings based on a cold
record is in virtually the same position as the appellate court that reviews its findings. See
Benoit v. Wilson, 150 Tex. 273, 282 (1951) (holding that a "court should never set aside
a jury verdict merely because the jury could have drawn different inferences or
conclusions" because the jury "has considered all the facts admitted before it and has, by
its answers, selected from the conflicting evidence and conflicting inferences that which it
considered most reasonable."). 

It is thus unclear why the trial court's findings should be given any special deference
in circumstances such as these. See Otis Elevator Co. v. Parmelee, 850 S.W.2d 179, 181
(Tex. 1993) ("Here, the trial court heard no evidence but expressly based its decision on
the papers filed and the argument of counsel. Under these circumstances, there are no
factual resolutions to presume in the trial court's favor."). Certainly, there is no intuitive
reason for giving the trial court's findings deference equal to those of a jury that sat through
the presentation of evidence and testimony and later deliberated to resolve conflicts in the
evidence. See, e.g., Texlan, Inc. v. Freestone County, 282 S.W.2d 283, 288-89 (Tex. Civ.
App.--Waco 1955, no writ) ("The jury, being the trier of the facts, had the duty and
responsibility of passing upon the credibility of the witnesses and determining the ultimate
issues before them and, in so doing, they could reject or accept the testimony of each
witness in whole or in part as they found the facts to be.").

 For the foregoing reasons, we do not proceed to the merits of this appeal without
stating that we are troubled by application of the traditional standards of legal and factual
sufficiency reviews to the case at bar. Notwithstanding these concerns, we conduct the
due-process personal-jurisdiction review by crediting evidence that supports the trial court's
findings of fact if reasonable jurors could, and by disregarding contrary evidence unless
reasonable jurors could not. See City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.
2005). 

Before applying this standard, we draw a clear distinction between the trial court's
findings of fact and the trial court's conclusions of law. The trial court's findings of fact may
be reviewed individually for legal and factual sufficiency, but the trial court's conclusions
of law are not susceptible to such review. BMC Software, 83 S.W.3d at 794. Instead, the
trial court's conclusions of law are reviewed de novo for legal correctness based on the
facts of the case. Id. 

In reviewing the correctness of the trial court's application of the law to the facts of
this case, we do not necessarily limit "the facts of the case" to the trial court's findings of
fact. Limiting "the facts of the case" to the trial court's findings of fact would create an
unnecessary bias for upholding the trial court's resolution of the broader, determinative
question of whether the defendant carried its burden to negate all bases for personal
jurisdiction. See BMC Software, 83 S.W.3d at 793. 

In this case, the trial court's findings of fact focused almost exclusively on the
contacts that Rockwood does not have in Texas. As the Villagomez family complains on
appeal, the trial court failed to issue additional findings of fact that they had requested and
that were supported by uncontested and admitted evidence. The additional findings of fact
requested by the Villagomez family tended to establish Rockwood's various forum
contacts. If, on appeal, "the facts of the case" were limited to the trial court's findings of
fact, Rockwood would appear to have fewer forum contacts than what was established by
the admitted and undisputed evidence. Yet, this result is not clearly contemplated in the
trial court's findings, which are silent on these contacts. In short, we have no basis for
concluding that the trial court found that these unstated contacts did not exist or that they
were otherwise inadequately supported by the evidence. We are also mindful that a trial
court has no need to make findings concerning facts that are admitted. See, e.g., Tex.
Eastern Transmission Corp. v. Sealy Indep. Sch. Dist., 572 S.W.2d 49, 51 (Tex. Civ.
App.--Houston [1st Dist.] 1989, no writ). 

The analysis below is a de novo review of the correctness of the trial court's answer
to the legal question of personal jurisdiction. The analysis demonstrates that Rockwood
failed to carry its burden to negate all bases for jurisdiction because the facts of the case
show that Rockwood has had continuous and systematic contacts in Texas. In conducting
this analysis and reviewing the facts of the case, we consider the evidence and reasonable
inferences supporting the trial court's findings of fact, as well as evidence that is (1)
contextual, (2) undisputed and admitted, and (3) allows of only one logical inference. 
Because such evidence cannot be disregarded by a reasonable trier of fact, it is the same
evidence that would be reviewed in a legal sufficiency analysis. See City of Keller, 168
S.W.3d at 827. Based on this evidence, we hold that Rockwood did not meet its burden
of negating jurisdiction and that the trial court erred as a matter of law by granting
Rockwood's special appearance and dismissing the claims against it for lack of personal
jurisdiction. 

III. Due Process Limitations on the Exercise of Personal Jurisdiction

 In the context of due process restrictions on the exercise of personal jurisdiction, the
United States Supreme Court has recognized that the individual interest protected is in not
being subject to the binding judgments of a forum with which the defendant has
established no meaningful contacts, ties, or relations. Van Cauwenberghe v. Biard, 486
U.S. 517, 526 (1988); Burger King, 471 U.S. 462, 471-72 (1985); Int'l Shoe Co. v.
Washington, 326 U.S. 310, 319 (1945). The Supreme Court has reaffirmed the oft-quoted
reasoning of Hanson v. Denckla, 357 U.S. 235, 253 (1958), that minimum contacts must
have a basis in "some act by which the defendant purposefully avails itself of the privilege
of conducting activities within the forum State, thus invoking the benefits and protections
of its laws." Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 109
(1987) (citing Burger King, 471 U.S. at 475). Where a defendant has "continuous and
systematic general business contacts" with the forum state, Helicopteros Nacionales de
Colombia, S. A. v. Hall, 466 U.S. 408, 415 (1984), the court may exercise "general"
jurisdiction over any action brought against that defendant. Id. at 414 n.9. Where contacts
are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of
or related to the defendant's contacts with the forum." Id. at 414 n.8. The exercise of
personal jurisdiction over a nonresident defendant must also comport with fair play and
substantial justice. See Burger King, 471 U.S. at 476-77; Commonwealth Gen. Corp. v.
York, 177 S.W.3d 923, 925 (Tex. 2005).

A. General Jurisdiction

 Determining the existence of personal jurisdiction does not involve an examination
of each contact with Texas viewed in isolation from one another. Holt Oil & Gas Corp. v.
Harvey, 801 F.2d 773, 779 (5th Cir. 1986). Rather, we are required to examine the
contacts in toto to determine whether they constitute the kind of continuous and systematic
contacts required to satisfy due process. Id.; Am. Type Culture, 83 S.W.3d at 809. 
Nevertheless, the continuous and systematic contacts test remains a difficult one to meet,
requiring extensive contacts between a defendant and a forum. Submersible Sys. v.
Perforadora Central, S.A. de C.V., 249 F.3d 413, 419 (5th Cir. 2001). Only once has the
United States Supreme Court upheld an exercise of personal jurisdiction when the suit was
unrelated to the defendant's contacts with a forum (i.e., based on general jurisdiction). Id.
(referring to Perkins v. Benguet Consol. Mining Co., 342 U.S. 437 (1952) (holding that Ohio
courts could exercise general jurisdiction over foreign corporation)). 

 General jurisdiction can be assessed by evaluating contacts of the defendant with
the forum over a reasonable number of years, up to the date the suit was filed. Access
Telecom, Inc. v. MCI Telecomm. Corp., 197 F.3d 694, 717 (5th Cir. 1999). "Jurisdiction is
proper . . . where the contacts proximately result from actions by the defendant himself that
create a 'substantial connection' with the forum State." See Asahi, 480 U.S. at 109
(quoting McGee v. International Life Insurance Co., 355 U.S. 220, 223 (1957)). When a
corporation "purposefully avails itself of the privilege of conducting activities within the
forum State," Hanson v. Denckla, 357 U.S. 235, 253 (1958), it has clear notice that it is
subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring
insurance, passing the expected costs on to customers, or, if the risks are too great,
severing its connection with the State. See Asahi, 480 U.S. at 110. The "purposeful
availment" requirement ensures that a defendant will not be haled into a jurisdiction solely
as a result of "random," "fortuitous," or "attenuated" contacts or of the "unilateral activity of
another party or a third person." See Nacionales de Colombia, 466 U.S. at 417; Keeton
v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984); World Wide Volkswagen Corp. v.
Woodson, 444 U.S. 286, 299 (1980). In the words of the Texas Supreme Court, "Certainly
a nonresident corporation ought to be subject to suit in any jurisdiction where it 'enjoys the
benefits and protection of the laws of that state.'" Michiana Easy Livin' Country, Inc. v.
Holten, 168 S.W.3d 777, 787 (Tex. 2005).

1. Rockwood's Contacts with Texas

 Rockwood is a holding company. Its corporate life began in 2000, when it
succeeded another holding company called Laporte, Inc. Before Rockwood was created,
Laporte owned Southern Clay and other subsidiaries. Since the year 2000, Rockwood has
been the sole owner of 13 subsidiaries doing business in various locations in the United
States. Three of Rockwood's subsidiaries have extensive, ongoing corporate operations
in Texas. Southern Clay, for instance, is organized under Texas law and has its principal
place of business in Texas. Rockwood also owns Compugraphics U.S.A., Inc. and
Chemical Specialties, Inc., which have physical locations and corporate operations in
Texas. 

 Because the validity of these contacts as legitimate due process forum contacts may
be unclear, it should be emphasized that under long-standing Texas law, separate
corporations are to be treated as distinct entities. See, e.g., BMC Software, 83 S.W.3d at
798. The Texas Supreme Court addressed the separateness of corporate identities some
four decades ago in Bell Oil, a case that involved the liability of a parent corporation in a
lawsuit arising from the activities of its subsidiary: 

The general rule seems to be that courts will not because of stock ownership
or interlocking directorship disregard the separate legal identities of
corporations, unless such relationship is used to defeat public convenience,
justify wrongs, such as violation of the anti-trust laws, protect fraud, or
defend crime.


Bell Oil & Gas Co. v. Allied Chemical Corp., 431 S.W.2d 336, 339 (Tex. 1968) (quoting
State v. Swift & Co., 187 S.W.2d 127, 133-34 (Tex. Civ. App. 1945, writ ref'd)). Many
years later, the Texas Supreme Court applied this general rule to a special appearance in
BMC Software, an opinion which stated that two separate corporations are to be treated
as distinct entities for purposes of personal jurisdiction unless an exception to the general
rule is applicable. See BMC Software, 83 S.W.3d at 798 (reaffirming the general rule
quoted in Bell Oil).

 Given that the rule adopted in Bell Oil remains the law in Texas and considering that
it has gone largely unchanged over the years, we conclude that in order to fairly apply the
rule to the instant case, it is necessary to first understand the context in which the rule was
originally articulated. 

 As noted above, Bell Oil adopted the general rule of corporate separateness from
language in Swift, an opinion by the Texas Court of Civil Appeals. See id. Like Bell Oil,
Swift did not involve any due process issues of personal jurisdiction. See Swift, 187
S.W.2d at 127. In articulating the general rule of corporate separateness that is now
applied across the board, the court relied on three cases: (1) Cannon Manufacturing Co.
v. Cudahy Packing Co., 267 U.S. 333 (1925); (2) State v. Humble Oil & Refining Co., 263
S.W. 319 (Tex. Civ. App. 1924, writ ref.); and (3) Berkey v. Third Avenue Ry. Co., 244 N.Y.
84 (1926). Although all three cases involved issues of corporate separateness, only
Cannon dealt with corporate separateness in the context of personal jurisdiction.

 In Cannon, a case which predates International Shoe and its progeny, the United
States Supreme Court stated that "Congress has not provided that a corporation of one
State shall be amenable to suit in the federal court for another State in which the plaintiff
resides, whenever it employs a subsidiary corporation as the instrumentality for doing
business therein." Cannon, 267 U.S. at 336. The Court further explained that "such use
of a subsidiary does not necessarily subject the parent corporation to the jurisdiction." Id. 
 Cannon's place in today's jurisprudence of minimum contacts is perhaps debatable. 
Through its reliance on Bell Oil and Swift, the Texas Supreme Court has signaled that
some continued application of pre-International Shoe case law is appropriate, at least as
it relates to issues of corporate separateness.

 Accordingly, in reaching today's decision, we are influenced by the Sixth Circuit's
eloquent interpretation of Canon vis-a-vis International Shoe from more than 40 years ago:

[T]he mere ownership by a corporation of all of the stock of a subsidiary
amenable to the jurisdiction of the courts of a state may not alone be
sufficient to justify holding the parent corporation likewise amenable. In the
early case of Cannon Mfg. Co. v. Cudahy Packing Co., the Supreme Court
held that the activities of a subsidiary did not subject its parent corporation
to the personal jurisdiction of local courts.


It should be noted that the ruling of the Cannon case, if not qualified by the
subsequent ruling in the International Shoe Company case, has been at least
qualified in later cases holding foreign corporations amenable to the personal
jurisdiction of local courts because of the local activities of subsidiary
corporations upon the theory that the corporate separation is fictitious, or that
the parent has held the subsidiary out as its agent, or, more vaguely, that the
parent has exercised an undue degree of control over the subsidiary. 


Unfortunately, such reasoning in these and similar cases, fails to explain the
decisions of the courts adequately. Thus the law relating to the fictions of
agency and of separate corporate entity was developed for purposes other
than determining amenability to personal jurisdiction, and the law of such
amenability is merely confused by reference to these inapposite matters.


The International Shoe decision represented an effort by the Supreme Court
to clarify earlier concepts in the area of the amenability of foreign
corporations to the personal jurisdiction of state courts by sweeping aside
any lingering notions that the earlier shibboleths of "consent," "presence,"
and "doing business" were self-defining abstractions, and by redefining those
tests in terms of "minimum contacts." Following this decision it would seem
appropriate, for the purpose of determining the amenability to jurisdiction of
a foreign corporation which happens to own a subsidiary corporation carrying
on local activities, to inquire whether the parent has the requisite minimum
contacts with the State of the forum. Thus the ownership of the subsidiary
carrying on local activities in Michigan represents merely one contact or
factor to be considered in assessing the existence or non-existence of the
requisite minimum contacts with the State of Michigan, but is not sufficient
of itself to hold the present foreign corporations amenable to personal
jurisdiction.


Velandra v. Regie Nationale des Usines Renault, 336 F.2d 292, 296-97 (6th Cir. 1964)
(internal citations omitted).

No theory has been alleged in this case that would permit the status of Rockwood
and Southern Clay as separate and distinct corporations to be disregarded. See id. at 799
("To 'fuse' the parent company and its subsidiary for jurisdictional purposes, the plaintiffs
must prove the parent controls the internal business operations and affairs of the
subsidiary."). For our purposes, Rockwood is a separate and distinct corporation from all
of its subsidiaries, including those doing business in Texas. See id. at 798. This means
that the subsidiaries' contacts with Texas cannot be imputed to Rockwood. See id. ("The
party seeking to ascribe one corporation's actions to another by disregarding their distinct
corporate entities must prove this allegation."). In other words, the fact that the
subsidiaries do business in Texas does not mean that Rockwood does business in Texas. 
See Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1160 (5th Cir. 1983) ("[S]o long as a
parent and subsidiary maintain separate and distinct corporate entities, the presence of
one in a forum state may not be attributed to the other."). 

 Preserving the corporate fiction allows Rockwood to remain distinct from its
subsidiaries, but it does not mean that Rockwood ceases to own the subsidiaries. 
Ownership of a subsidiary conducting business in Texas is a forum contact. See, e.g.,
Velandra, 336 F.2d at 296-97. Although ownership of a local-operating subsidiary may not
be enough for minimum contacts outside the context of alter ego or similar conceptual
devices, it is nevertheless error to exclude this legitimate forum contact from consideration
in toto with the defendant's other forum contacts in making a determination of whether the
defendant has conclusively negated the propriety of exercising general jurisdiction. See
Alpine View Co. v. Atlas Copco AB, 205 F.3d 208, 218 (5th Cir. 2000) ("[A] foreign parent
corporation is not subject to the jurisdiction of a forum state merely because its subsidiary
is present or doing business there; the mere existence of a parent-subsidiary relationship
is not sufficient to warrant the assertion of jurisdiction over the foreign parent") (citing
Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1159 (5th Cir. 1983)); Bank v. Wedge
Group, Inc., 882 F.2d 1087, 1090 n.1 (6th Cir. 1989) ("[T]he ownership of a subsidiary that
conducts business in the forum is one contact or factor to be considered in assessing the
existence or non-existence of the requisite minimum contacts.") (internal citations omitted).

 The findings of fact and conclusions of law filed in this case indicate that the trial
court failed to consider ownership of the subsidiaries as a forum contact. The court found
that Rockwood is a "holding company" and that its subsidiaries are "independent" and
"operate day-to-day on their own." One of the findings of fact states, "Rockwood's
interactions with Southern Clay, as well as with its other subsidiaries, are the ordinary and
customary sorts of interactions that parent corporations have with their subsidiaries." The
trial court also found that "Rockwood engages in the normal exchange associated with
ownership of Southern Clay, its Texas-based subsidiary, along with other subsidiaries that
maintain facilities in Texas. That normal exchange includes infrequent trips to Texas by
Rockwood employees along with some business-related communications, both oral and
electronic, with persons and entities in Texas."

 The foregoing findings have been challenged on appeal for legal and factual
sufficiency. They have also been challenged as being, in large part, improper and
erroneous conclusions of law. Without going into these issues, we observe that none of
the foregoing findings is in any way inconsistent with Rockwood's complete ownership of
three subsidiaries with operations in Texas. In fact, the trial court's findings include
statements that verify Rockwood is the sole owner of at least three corporations operating
in Texas. 

 These factors must be added to the in toto de novo review of whether minimum
contacts have been negated. In doing so, we emphasize that this case involves more than
simple ownership of three Texas subsidiaries. This is not a case where the only contact
with Texas is ownership of stock in a Texas corporation. None of the forum contacts of
Rockwood's subsidiaries need be attributed to Rockwood to demonstrate its minimum
contacts within Texas. See Freudensprung v. Offshore Tech. Servs., 379 F.3d 327, 346
(5th Cir. 2004) ("As a general rule, . . . the proper exercise of personal jurisdiction over a
nonresident corporation may not be based solely upon the contacts with the forum state
of another corporate entity with which the defendant may be affiliated."). 

 Rockwood argues against this approach in its appellate brief, stating, "[N]o
jurisdictional weight is [to be] given to contacts occurring as part of the normal relationship
between two distinct corporations such as a parent and its subsidiaries, even where such
contacts occur in Texas." Appellee's Brief p. 14. Only one case is cited for Rockwood's
statement of the law. See Preussag Aktiengesellschaft v. Coleman, 16 S.W.3d 110,
119-20 (Tex. App.--Houston [1st Dist.] 2000, pet. dism'd w.o.j.). In that case, which
involved indirect rather than direct subsidiaries, the First Court of Appeals made the
following observation about the jurisdictional separateness of parents from their
subsidiaries: "[The] cases do not create a rule that, outside an alter ego situation, a
parent's normal relationship with its subsidiary, pursuant to an overarching system that is
not directed at any particular state, suffices to subject the parent to jurisdiction in its
subsidiary's state." Preussag, 16 S.W.3d at 119-20. 

We believe this to be an accurate statement of the law. In the only cases in which
it has considered the question, the United States Supreme Court held that the activities of
a subsidiary are not necessarily enough to render a parent subject to a court's jurisdiction,
for service of process or otherwise. See Volkswagenwerk Aktiengesellschaft v. Schlunk,
486 U.S. 694, 705 (1988) (citing cases including Cannon). Courts have interpreted this to
mean that if a corporation's only contact with the forum is its ownership of a distinct and
separate corporation doing business independently in the forum, no minimum contacts
exist unless the forum contacts of the subsidiary can be attributed to the parent.
Freudensprung, 379 F.3d at 346 (collecting cases).

 No such theory is in play here. Even so, we do not dismiss any factor as "normal"
without considering it in toto with the other factors. We disagree with Preussag insofar as
the term "normal" has never been part of the due-process, personal-jurisdiction lexicon. 
As a yardstick of corporate amenability to suit in Texas, we find it devoid of objective utility. 
This is well demonstrated in the instant case, where Rockwood has employed the
expression "normal relationship" as a vessel for collecting direct forum contacts and
smuggling them out of the minimum contacts analysis before any due process
determinations are made. 

 This approach undermines the state's interest in providing a judicial forum for the
resolution of its civil controversies and is unduly subversive to the state's sovereignty. The
Court's due process inquiry should not be commandeered through unwarranted contortions
of the accepted minimum contacts nomenclature that result in the defendant's direct forum
contacts being excluded from consideration in toto with all of the defendant's other forum
contacts in our de novo review of minimum contacts. 

 Rockwood's ownership of subsidiaries doing business in Texas amount to forum
contacts, even if, standing alone, they are insufficient for the exercise of general
jurisdiction. See Freudensprung, 379 F.3d at 346. Our mandate in undertaking these
inquires is not to consider and reject forum contacts in isolation, but to evaluate the
contacts in toto. See Holt Oil, 801 F.2d at 779; Am. Type Culture, 83 S.W.3d at 809. 
Accordingly, we proceed to identify Rockwood's other contacts with the forum before
passing on the issue of whether general jurisdiction exists. 

 Another series of factors or forum contacts apparently not considered in the trial
court's minimum contacts inquiry involve a written contract executed in 2001 by Michael
Kenny, the then-President of Rockwood, and Vernon Sumner. The contract was submitted
as evidence, and its existence and performance were verified by uncontested and
uncontradicted deposition testimony, including testimony by Vernon Sumner. The contract,
to which Southern Clay is not a signatory, states in part:

We are pleased to confirm our offer of employment as President and
Managing Director of our Clay Additives business on a full-time and exclusive
basis. For purposes of facilitating your employment, you will be assigned to
and employed by our subsidiary, Southern Clay Products, Inc. (hereafter
"Southern Clay"). It is our understanding that you will commence
employment on or before August 20, 2001. You will have direct reporting
responsibility to the President of Rockwood Specialties, Inc. (hereinafter
"Rockwood"). We reserve the right, at our discretion, to change your
responsibilities or job title at any time.


 In addition to a copy of the written contract, the trial court was also provided with
deposition testimony regarding the parties' execution and performance of the contract. 
Sumner testified to the following facts in his deposition and affidavit: 

Sumner was living in Pennsylvania at the time of contracting with Rockwood
and has since moved to Texas, where he has continuously maintained his
residence pursuant to the contract; 


Sumner had to relocate to Texas and reside there in order to perform his
contract with Rockwood; 


The contract is governed by Texas law;


The contract makes Sumner responsible for a "basket of businesses," which
Sumner identifies as the "Clay Additive business" and not simply as Southern
Clay; 


Sumner's Texas office is in Austin rather than in Gonzales, where Southern
Clay is located;


Sumner's "basket of businesses" under his contract with Rockwood includes
the operations of Southern Clay and Rockwood Additives, Ltd., two separate
corporations for which Sumner is the managing director and "essentially"
chief executive officer; 


Sumner's earnings at Rockwood Additives are consolidated with his earnings
at Southern Clay, and by his decision, all of his earnings are paid by
Southern Clay; 


By election, Sumner could have his earnings allocated back to Rockwood
Additives for payment, but he declines to do so; 


Sumner considers Southern Clay his employer; 


Southern Clay pays Sumner's unemployment and workers' compensation
premiums;


Sumner's office is leased by Southern Clay, and Southern Clay employs all
of the staff employed there. Southern Clay pays for all of the equipment and
furnishing at the office, and it pays the telephone and electricity bills; 


Rockwood has limited Sumner's authority as Southern Clay president to
expenditures less than $250,000. Amounts greater than this require written
approval by Rockwood's president; 


Rockwood has the right to change Sumner's responsibilities and job title at
its discretion at any time; 


Sumner is directly responsible to Seifi Ghasemi, the current president of
Rockwood, and has regular contact with him; 


Sumner communicates with the president of Rockwood "concerning the
ongoing business activities and results of Southern Clay on average about
once a month, by phone. In addition, a written monthly report is provided";


Sumner's contract with Rockwood may only be modified by an agreement in
writing, singed by Sumner and an "authorized representative of Rockwood"; 


The contract has never been modified;


The contract has been continuously performed in Texas;


Sumner also conducts business for Rockwood Additives, Ltd. out of his
Austin office;


By Sumner's estimate, he visits Southern Clay only "about once a month"; 


Sumner could not confirm that he had visited Southern Clay even once in the
year 2002, even though at the time, he was Southern Clay's president and
managing director; and


Rockwood, as the sole shareholder, annually sets performance goals for
Southern Clay (and its other subsidiaries) based on the budgets prepared by
each subsidiary. As President of Southern Clay, Sumner is responsible for
determining and conducting the business affairs of Southern Clay in order to
meet or exceed those goals. 


 The deposition testimony of other witnesses was also produced for the trial court's
consideration on the issue of Sumner's contract with Rockwood. This evidence included
testimony from Keith Stultz, the Operations Manager of Southern Clay, who runs Southern
Clay's day-to-day operations. Stultz could not identify Sumner's exact job title. According
to Stultz, Sumner does not have "day-today-involvement" with Southern Clay and working
for Southern Clay is not Sumner's "day-to-day job." Nevertheless, Stultz testified that
Sumner is the person he answers to, the person who has the "ultimate responsibility of the
facility," "the ultimate responsibility for the safety program," and "the ultimate responsibility
for whether or not there is adequate safety training." 

Stultz was not the only high-ranking Southern Clay official who could not identify
Sumner's job title. Rick Holmes, Southern Clay's Safety, Health, and Environmental
Manager, also testified that he could not identify Sumner's job title, but he confirmed that
no one at Southern Clay holds a higher title than Sumner. 

Donna Abrunzo, an "assistant secretary" in Rockwood (and all of its subsidiaries,
including Southern Clay) gave deposition testimony that Sumner is part of Rockwood's "top
executive team." 

 The evidence also includes an inter-office memorandum by Rockwood that
announces Sumner's appointment as "Managing Director of the Rockwood Clay-Additives
Division and President of Southern Clay, Inc." The announcement was written by Kenny,
the then-President of Rockwood, and includes statements such as "Vern joins us," "[Vern]
will relocate from Pennsylvania to Texas," "Vern will report to me," and "[J]oin me in
welcoming Vern to our organization." 

 The trial court issued numerous findings of fact that failed to address the
uncontested and uncontradicted evidence establishing Rockwood's continuing contractual
relationship with Sumner and Rockwood's Texas forum contacts arising from that
relationship:

9. Rockwood has never been a party to any contracts whereby it is
obligated to perform services in Texas. 


10. Rockwood has never specifically recruited residents of Texas for
employment, and Rockwood has never employed any Texas
residents. 


13. None of Rockwood's employees lives in Texas.


39. All of Southern Clay's account and financial records are maintained
at Southern Clay's facilities in Gonzales, Texas.


42. Mr. Stultz is responsible for the day-to-day operations of Southern
Clay and does not report to or take direction from Rockwood with
respect to the day-to-day operations of Southern Clay. 


54. Vernon Sumner, the President and Managing Director of Southern
Clay, is employed by Southern Clay. Mr. Sumner is not an employee
of Rockwood.


55. Mr. Sumner's salary and his relocation expenses were and are paid
by Southern Clay and not by Rockwood. 


56. Southern Clay pays Mr. Sumner's social security taxes and withholds
federal income taxes from his earnings.


57. Southern Clay pays unemployment and workers' compensation
premiums on behalf of Mr. Sumner. 


58. Southern Clay pays Mr. Sumner's benefits, reimburses his travel
expenses and pays for his company car. 


59. Mr. Sumner's office and its staff and equipment are supplied and paid
for by Southern Clay.


60. Mr. Sumner is responsible for determining and conducting the
business affairs of Southern Clay, and he decides how to meet
various production and performance goals by consulting with
Southern Clay managers and employees. 


61. Rockwood does not employ any personnel that are also employed by
Southern Clay.


62. Rockwood does not maintain any common facilities with Southern
Clay. 


The Villagomez family has raised legal and factual sufficiency challenges to most
of these findings. We conclude that it is unnecessary to resolve these specific challenges
individually to hold--in response to the series of objections and issues raised by the
Villagomez family--that the trial court erred by neglecting to consider admitted and
undisputed evidence proving that Rockwood has maintained a continuous contractual
relationship with a Texas resident to perform services in Texas. 

 We find it noteworthy that the trial court did not issue any findings to the effect that
no contract exists between Rockwood and Sumner. Its findings on this subject are limited
to whether an employer-employee relationship has ever existed between Sumner and
Rockwood or Sumner and Southern Clay. This is an unduly restrictive and unfair
approach, given that it was accomplished without reference to any guiding rules, principles,
or precedent. By focusing on the narrow issue of a possible employer-employee
relationship, the trial court obscured undisputed forum contacts that exist regardless of
Rockwood's rhetorical interpretation of the evidence. Rockwood and Sumner have a
contract for services that has been continuously performed in Texas. Without approving
or reviewing the sufficiency of the evidence to support the trial court's finding that Sumner
is employed by Southern Clay, we hold that the trial court erred by failing to consider as
forum contacts Rockwood's ongoing and unmodified contract with Sumner and the
performance of the contract in Texas. 

 Likewise, we also add to the list of forum contacts Rockwood's contacts with
Southern Clay in relation to the Rockwood-Sumner contract. Southern Clay is not a
signatory to the contract, but it is certainly involved in its performance. Rockwood has thus
contacted and done business in Texas and with Texans by directly and purposefully
providing Southern Clay with corporate leadership in Texas through the Rockwood-Sumner
contract. 

 In adding this set of contacts to the growing list, we note that the courts have
recognized that corporate formalities and "technicalities" should be considered in a due-process, personal-jurisdiction analysis. See Bearry v. Beech Aircraft Corp., 818 F.2d 370,
376 (5th Cir. 1978); Smith v. Piper Aircraft Corp., 425 F.2d 823, 826 (5th Cir. 1970). That
Southern Clay is not a signatory to the contract with Sumner might be a technicality in the
view of some, but if so, it is a technicality that works strongly against Rockwood. 
Considering Rockwood's level of sophistication and the record demonstrating its ability to
structure its transactions to benefit from the laws of various jurisdictions, including those
of Texas, it is significant that Rockwood elected to enter this contract in its corporate
capacity rather than allowing its "independent" subsidiary to hire and manage a president
through its own board of directors. 

To Rockwood's credit, Riordan testified on these issues. He testified that Rockwood
actually entered the contract in its capacity as sole shareholder of Southern Clay and that
Mr. Kenny executed the contract as a member of Southern Clay's board of directors. 

We note that the contract does not support Riordan's testimony insofar as he
suggested that Southern Clay is a party to the contract: (1) the contract is on Rockwood
letterhead; (2) it identifies Rockwood and Sumner as the sole parties; (3) only Rockwood's
president, Mr. Kenny, signed the document for Rockwood; (4) the contract states that Mr.
Kenny signed in his capacity as Rockwood's president, not in any capacity as a board
member for Southern Clay; and (5) no reference is made to the shareholders or board
members of Southern Clay. In addition, Sumner testified that Mr. Kenny signed the
contract in his capacity as Rockwood's president and did not testify that he knew Mr.
Kenny was a member of Southern Clay's board of directors. 

Based on the admitted and uncontested evidence, a rational finder of fact could not
have concluded that Rockwood attempted to structure its contacts with Sumner to avoid
its corporate participation in the performance of Sumner's services in Texas. That
Rockwood specifically invoked Texas law to govern its dealings with Sumner in
Texas--though perhaps arguably insignificant in and of itself--further shows the purposeful
nature of Rockwood's direct contacts in Texas. 

The evidence also shows the following activities that amount to direct forum
contacts:

1. Rockwood has promulgated a "Records Management Policy," which, by its terms
applies to Rockwood and to all of its subsidiaries, including those with operations
in Texas. The policy instructs the subsidiaries to identify, process, and retain
certain records and provides a "guideline" for accomplishing this mandate, stating
that "each subsidiary is responsible for establishing and maintaining its own
Records Management program." The policy also states, "Records generated by or
for Rockwood Specialties Inc. and/or its subsidiaries are the property of Rockwood
Specialties Inc. and/or its subsidiaries rather than the individuals or the areas that
generate or maintain it."


Two members of Southern Clay's management testified to Rockwood's Records
Management Policy.


Sumner testified that he was familiar with the Records Management Policy and that
Southern Clay has not "followed it" because he sees it, not "as a mandate," but "as
guidance." When asked how Southern Clay did not follow the policy, Sumner
testified, "We haven't been particularly rigorous in going back in each of the
departments and auditing ourselves to make sure that we are throwing things out
. . . on a regular basis." When questioned further on the specific parts of the policy
Southern Clay did not follow, Sumner testified that Southern Clay had essentially
fallen behind on "some housekeeping." 


Stultz testified that the policy says what it says, but he testified that he does not
know whether Southern Clay follows it. He testified that he has personally never
followed it. He could not identify anyone with whom he discussed this decision, nor
could he identify how he did not follow the policy. 


2. Rockwood has ongoing, "arm's length" commercial transactions with Southern Clay. 
The record includes copies of two interest-bearing promissory notes totaling $39
million. These notes were executed in October 2001 by the board of directors of
Southern Clay in their capacity as board members. Although the notes were signed
with provisos stating that they could not be assigned to other holders and that New
York law would govern any and all disputes, Rockwood later "cancelled" the notes
and assigned them to another corporation. Southern Clay still owes the full amount
of the notes. 


3. Rockwood acts like a "bank" to its subsidiaries in Texas, providing "arms-length"
commercial financial services totaling untold amounts.


4. Rockwood interacts directly with the directors, officers, and personnel of Southern
Clay and its other Texas subsidiaries through its incentive bonus plan and provision
of group health insurance. 


5. Rockwood has an ongoing contract with Health First, a separate corporation doing
business in Texas. Donna Abrunzo entered into an agreement, on January 1, 2003,
on behalf of Rockwood with Health First, a third-party administrator located in Tyler,
Texas. The contract states that Rockwood is organized under Texas law. Although
Abrunzo testified that the contract is inaccurate in that regard, she confirmed it was
executed with the inaccuracy. The contract indicates that it will be performed in
Texas. The evidence shows that the services performed in Texas by Health First
at Rockwood's direction were also directed to benefit persons connected to
Rockwood's subsidiaries, including those subsidiaries operating in Texas. 


6. Rockwood has commissioned property conservation studies and surveys with third-party corporations in Texas which have occurred in Texas for the benefit of its
Texas subsidiaries, including Southern Clay. These studies have dealt with
numerous issues, including risk assessment and management.


7. Rockwood sends employees, often including Mike Piacentino, Rockwood's Director
of Environmental, Risk, and Safety Management, to Texas to assist its subsidiaries
in material, non-financial issues specific to their individual Texas locations and
operations, such as passing safety audits and dealing with federal regulatory
agencies such as OSHA and MSHA. This happened in 2001, 2002, and 2003. 

8. In 2002, Rockwood contracted with Hartford Steam Boiler Inspection and Insurance
Co., which maintains an office in Houston, Texas. At Rockwood's direction,
Hartford Steam performed internal inspections of three high-pressure fire tube
boilers located at Southern Clay's facility in Gonzales, Texas.


9. Rockwood contracted with Royal Sun Alliance to perform boiler inspections which
occurred at Southern Clay's facility on December 21, 2001.


 10. Rockwood's employee, Mike Piacentino, has participated, at the sole direction of
Rockwood, in multiple investigations following accidents involving the injury or death
of Texas residents at Southern Clay in the years 2001 and 2003. In one
investigation, Piacentino was designated the "team leader."


 11. Acting as Rockwood's employee, Piacentino helped Southern Clay, MSHA officials,
and others recreate accidents involving the injury or death of Texas residents at
Southern Clay in the years 2001 and 2003. 


 12. Acting as Rockwood's employee, Piacentino authored reports of accidents involving
the injury or death of Texas residents which Southern Clay filed with MSHA in the
years 2001 and 2003.


 13. Acting as Rockwood's employee, Piacentino performed a "Process Hazards Audit"
at Southern Clay's facility in Texas in the years 2001 and 2002. 


 14. Although Piacentino is an employee of Rockwood and not Southern Clay, his name
and his work and mobile phone numbers are listed as "Southern Clay Products
Contacts" on Southern Clay's "Emergency Numbers," which is included in the
Southern Clay Products Safety Manual. Employees of Southern Clay are given
copies of the manual and are trained on it. 


 15. According to Rockwood executive and counsel Tom Riordan, "[F]rom a safety
standpoint, Mr. Piacantino is essentially monitoring safety [at the subsidiaries in
Texas] on behalf- on behalf of the holding company [Rockwood]." 


 16. Rockwood provides each of its subsidiaries, including those in Texas, with a
mandatory Safety, Health, and Environment ("SHE") Management Program
Guidance Manual, which includes, among other things, reporting schedules for the
subsidiaries to use in making their routine communications with Rockwood. 


 17. Rockwood's SHE guidelines are mandatory, but they give Rockwood subsidiaries
latitude to create their own policies and programs to meet or exceed the
expectations set by Rockwood.


 18. Rockwood's employee, Piacentino, has regular and scheduled contact,
communication, and correspondence with Rockwood's various subsidiaries,
including those in Texas, on issues related to Rockwood's SHE guidelines and the
subsidiaries' programs and performance related to the SHE guidelines. 


 19. From November 27, 2000, when Rockwood was created, until the time of suit in
2003, Rockwood officers and employees, including its Chairman and CEO and Vice
President and CFO, among others, made trips to Texas at least 23 times. 


 20. Seventeen of the visits were for "business," to use Rockwood's description, or for
reasons that appear to be business related (for instance, one of the reasons listed
is a "global sales meeting"). 


 21. Rockwood's former President, Mr. Kenny, made trips to Texas in 2001 and 2002. 
According, to Rockwood, the trips were for "unknown" reasons. There is no
indication in the record that the trips were for personal affairs. The records
produced by Rockwood show the trips listed along side four other trips Mr. Kenny
made to Texas in 2001 and 2002 that are business related. 


2. Minimum Contacts Analysis

 Jurisdiction depends upon the facts of each case. See, e.g., People's Tobacco Co.
v. American Tobacco Co., 246 U.S. 79, 86-87 (1918). In passing on the merits of the
above-mentioned factors as evidence of a substantial connection for minimum contacts,
we are heavily influenced by how Learned Hand described general corporate forum
contacts more than a lifetime ago:

 It scarcely advances the argument to say that a corporation must be
"present" in the foreign state, if we define that word as demanding such
dealings as will subject it to jurisdiction, for then it does no more than put the
question to be answered. Indeed, it is doubtful whether it helps much in any
event. It is difficult, to us it seems impossible, to impute the idea of locality
to a corporation, except by virtue of those acts which realize its purposes.
The shareholders, officers and agents are not individually the corporation,
and do not carry it with them in all their legal transactions. It is only when
engaged upon its affairs that they can be said to represent it, and we can
see no qualitative distinction between one part of its doings and another, so
they carry out the common plan. If we are to attribute locality to it at all, it
must be equally present wherever any part of its work goes on, as much in
the little as in the great.


 When we say, therefore, that a corporation may be sued only where it is
"present," we understand that the word is used, not literally, but as shorthand
for something else. 


Hutchinson v. Chase & Gilbert, 45 F.2d 139, 141 (2d Cir. 1930).

 In doing so, we are also following the precedent of the United States Supreme
Court:

Since the corporate personality is a fiction, although a fiction intended to be
acted upon as though it were a fact, Klein v. Board of Supervisors, 282 U.S.
19, 24, it is clear that unlike an individual its "presence" without, as well as
within, the state of its origin can be manifested only by activities carried on
in its behalf by those who are authorized to act for it. To say that the
corporation is so far "present" there as to satisfy due process requirements,
for purposes of taxation or the maintenance of suits against it in the courts
of the state, is to beg the question to be decided. For the terms "present" or
"presence" are used merely to symbolize those activities of the corporation's
agent within the state which courts will deem to be sufficient to satisfy the
demands of due process. L. Hand, J., in Hutchinson v. Chase & Gilbert, 45
F.2d 139, 141. Those demands may be met by such contacts of the
corporation with the state of the forum as make it reasonable, in the context
of our federal system of government, to require the corporation to defend the
particular suit which is brought there.


International Shoe, 326 U.S. at 316-17.

Having reviewed Rockwood's Texas forum contacts in toto, we are satisfied that
there is enough for minimum contacts. As a holding company, Rockwood's business is
very specialized. Rockwood has no traditional "operations," nor is it supposed to. Holding
companies generally do not exist to provide goods or services; rather, they exist to hold
controlling equity interests in other entities (e.g., stock in other corporations), which may
or may not provide goods or services of their own. 

Although Rockwood is a holding company, the admitted and undisputed evidence
shows that Rockwood does more than merely "hold" stock. Rockwood conducts business
in Texas by owning other businesses in Texas and by directly facilitating the profitability of
such businesses through myriad integrated systems of commercial transactions, finance,
communication, executive oversight, safety, and corporate accountability, to give a non-exhaustive list. This business often involves the physical presence of Rockwood's
personnel in Texas. 

The connection between Rockwood and its Texas subsidiaries, including Southern
Clay, is substantial in this regard, but their corporate identities remain distinct. Insofar as
the day-to-day operations of subsidiaries such as Southern Clay are concerned, the record
shows that it is the subsidiaries themselves that run the businesses, not Rockwood. For
instance, the person actually running Southern Clay's day-to-day operations is Keith Stultz,
not Vernon Sumner. Stultz is a long-time employee of Southern Clay and has no
employment history with Rockwood or its predecessor corporation Laporte, which
previously owned Southern Clay and employed Mike Piacentino, Tom Riordan, and others
who now work for Rockwood. (1) 

Nevertheless, the admitted and uncontested evidence establishes that Sumner is
the highest ranking official at Southern Clay and that Southern Clay's top management is
accountable to Sumner for the day-to-day operations of the business. Sumner also uses
his office in Austin to serve as president and managing director of a second corporation
called Rockwood Additives, Ltd., which is located in the United Kingdom. Sumner is
directly accountable to Rockwood, both in practice and by written agreement. No evidence
of any written agreement between Sumner and Southern Clay or its board of directors has
been produced by Rockwood, though Rockwood has long contended that Sumner is
Southern Clay's employee. Regardless of whether that assertion is ultimately true or false,
the fact remains that Rockwood has failed to adequately address its ongoing contractual
relationship with Sumner for services Sumner provides in Texas under Texas law. 

Furthermore, Sumner's services for Rockwood are no paltry matter of shipping odd
materials or corresponding by mail. They go to the heart of Rockwood's business. In
contracting directly with Sumner to make Sumner ultimately accountable for the profitability
of Southern Clay's business in Texas but giving Sumner no day-to-day function at
Southern Clay, Rockwood extended directly into Texas its business of owning other
businesses and directly facilitating their profitability. 

This Court should not disregard corporate formalities to defeat general jurisdiction. 
See Bearry, 818 F.2d at 376; Smith, 425 F.2d at 826. Rockwood could have severed its
connection with Texas by having Sumner contract with Southern Clay and report directly
to Southern Clay's board of directors; yet, Rockwood chose to enter Texas to contract and
interact with Sumner directly in its corporate capacity as Rockwood, not from behind the
veil of Southern Clay's board of directors. 

The above-listed contacts demonstrate that Rockwood has purposefully availed
itself of the privilege of conducting activities within Texas in its corporate capacity, rather
than merely through its subsidiaries. See Asahi, 480 U.S. at 109. Rockwood's activities
have created a substantial connection with Texas. See id. Accordingly, we conclude that
Rockwood purposefully established the minimum contacts necessary to be amendable to
suit in Texas. See Michiana, 168 S.W.3d at 787 ("Certainly a nonresident corporation
ought to be subject to suit in any jurisdiction where it 'enjoys the benefits and protection of
the laws of that state.'"). 

B. Fair Play and Substantial Justice 

 Once it has been determined that the nonresident defendant purposefully
established minimum contacts with the forum state, the contacts are evaluated in light of
other factors to determine whether the assertion of personal jurisdiction comports with fair
play and substantial justice. Asahi, 480 U.S. at 113-15. These factors include (1) the
burden on the defendant, (2) the interests of the forum state in adjudicating the dispute,
(3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate
judicial system's interest in obtaining the most efficient resolution of controversies, and (5)
the shared interest of the several States in furthering fundamental substantive social
policies. World-Wide Volkswagen, 444 U.S. at 292; Asahi, 480 U.S. at 113. These
considerations sometimes serve to establish the reasonableness of jurisdiction upon a
lesser showing of minimum contacts than would otherwise be required. Burger King, 471
U.S. at 477. The opposite may also be true. That is, even if the nonresident defendant
has purposely established minimum contacts with the forum state, the exercise of
jurisdiction may not be fair and reasonable under the facts in a particular case. Burger
King, 471 U.S. at 477-78.

 Rockwood's brief to the trial court in support of its special appearance included a
paragraph of arguments on the five factors enumerated above. The paragraph contains
no citation to authorities or evidence, but we will nevertheless address the points raised. 
Among other things, Rockwood argued that the exercise of personal jurisdiction in this
case would be repugnant to notions of fair play and substantial justice because it
"maintains no offices or employees in Texas, and any witnesses Rockwood would call to
trial reside in New Jersey." We find the first part of this argument particularly unpersuasive
because the same or similar could be said of virtually all nonresident defendants being
haled into state court. As a national corporation with ongoing and pervasive contacts with
Texas, Rockwood is especially well suited for this type of out-of-state litigation. We
therefore conclude that the first factor does not militate in any meaningful respect towards
a conclusion that maintenance of the suit in Texas would offend notions of fair play and
substantial justice. See World-Wide Volkswagen, 444 U.S. at 292. 

 Rockwood also argued before the trial court that the "interests of Texas are not
served by calling Rockwood to court in Texas. In fact, the inclusion of Rockwood as a
defendant is little more than an effort to subvert Texas workers' compensation law by
naming a defendant that is not protected from negligence claims by the workers'
compensation scheme." Although the foregoing argument is ostensibly based on
Rockwood's aversion to suit, part of it does speak to the interests of the forum state in
adjudicating the dispute. See id. To the extent the second factor is implicated by the
argument, we conclude that Texas has a strong sovereign interest in providing a forum for
lawsuits that seek to hold out-of-state corporations accountable for wrongful deaths that
they cause in Texas. That Southern Clay may be liable for the same death but in the
capacity of an employer rather than a third party only serves to strengthen the state's
interest in providing a single forum to resolve such controversies. The second factor
therefore militates strongly in favor of the Villagomez family and maintenance of their suit
in Texas. 

 Rockwood also argued that "the plaintiffs' interest in obtaining relief may be fully
served by its [sic] suit against Southern Clay, without the necessity of joining Rockwood." 
Given that no authority, evidence, or argument was advanced in support of this statement,
we can only surmise that it is no more than a rhetorical point premised largely on a
procedurally untenable presumption that Rockwood is not culpable for Mr. Villagomez's
death. At this early stage of the proceedings, the merits of this case should not be litigated
or presumed in Rockwood's favor simply to defeat the court's otherwise constitutional
exercise of personal jurisdiction over a nonresident corporation.

 Finally, Rockwood argued that "[a]s for the last two considerations, system efficiency
and furtherance of social policies are both served by declining to exercise personal
jurisdiction over Rockwood." Again, the legal underpinnings of these arguments have gone
undeveloped by Rockwood. 

 For these reasons, we conclude that Rockwood did not establish that maintenance
of this suit in Texas would offend notions of fair play and substantial justice. 

IV. Conclusion

 The trial court erred by granting the special appearance because Rockwood failed
to negate the existence of general jurisdiction. Without addressing specific jurisdiction, we
reverse the court's order and remand for further proceeding consistent with this opinion. 
 

 

 ________________________ DORI CONTRERAS GARZA, 

 JUSTICE

 

 Dissenting Opinion by

 Justice Errlinda Castillo.


 Opinion delivered and filed this 

 the 30th day of November, 2006. 
1. Rockwood has proceeded through its special appearance with the apparent understanding that its
jurisdictional forum contacts with Texas are not to include the forum contacts of the corporation from which
Rockwood directly succeeded. We question whether this is proper. As the Seventh Circuit recently noted:


[S]everal courts have recognized that the jurisdictional contacts of a predecessor corporation
may be imputed to its successor corporation without offending due process. See Patin v.
Thoroughbred Power Boats Inc., 294 F.3d 640, 654 (5th Cir. 2002) ("[A] successor
corporation that is deemed to be a 'mere continuation' of its predecessor corporation can be
bound by the predecessor corporation's voluntary submission to the personal jurisdiction of
a court."); Williams v. Bowman Livestock Equip. Co., 927 F.2d 1128, 1131 (10th Cir. 1991)
("A corporation's contacts with a forum may be imputed to its successor if forum law would
hold the successor liable for the actions of its predecessor."). The Fifth Circuit in Patin
explained that the rationale for such a rule is that, because the two corporations "are the
same entity, the jurisdictional contacts of one are the jurisdictional contacts of the other for
the purposes of the International Shoe due process analysis." Patin, 294 F.3d at 653.


 Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 783-84 (7th Cir. 2003) (footnotes
omitted). 


 Given that the burden is on Rockwood to negate all bases for jurisdiction, see BMC Software, 83
S.W.3d at 793, and considering the admitted and undisputed evidence showing that Rockwood
succeeded from a corporation that had direct Texas forum contacts, we conclude that Laport's forum
contacts should have been addressed by Rockwood.